Charles H. MOSBY, Jr., et al.

v.

William V. DEVINE, in his capacity as Chief of the Rhode Island Bureau of Criminal Identification, and Patrick C. Lynch, in his capacity as Rhode Island Attorney General.[1]

No. 2001–161–Appeal.

Supreme Court of Rhode Island.

June 10, 2004.

1. The original named defendants in this case were Vincent McAteer, in his capacity as chief of the Rhode Island Bureau of Criminal Identification, and Sheldon Whitehouse, in his capacity as Attorney General. The caption has been changed to reflect the current administration. See Super. R. Civ. P. 25(d).

David J. Strachman, Providence, for Plaintiff.

Susan Orso, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

Few topics have been as controversial as that of the government's right to restrict an individual's capacity to carry a gun. The current controversy began when the plaintiffs, Charles H. Mosby (Mosby) and Steven Golotto (Golotto) (collectively re-

ferred to as plaintiffs), applied to the Rhode Island Department of the Attorney General for permits to carry a concealed weapon. The defendants, the chief of the Rhode Island Bureau of Criminal Identification and the Rhode Island Attorney General (collectively referred to as the department), denied the plaintiffs' applications. The plaintiffs sought Superior Court review of the department's decision. A Superior Court motion justice concluded that an application to carry a concealed weapon was not a contested case because a hearing is neither required under the terms of the permitting statute nor under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Because the review of an application to carry a concealed weapon is not a contested case, the plaintiffs' case was dismissed for lack of subject-matter jurisdiction under the Administrative Procedures Act (APA), G.L. 1956 chapter 35 of title 42. We affirm the judgment of the Superior Court.

I

**Facts and Travel**

In 1998, plaintiffs submitted separate applications to the department seeking permits to carry concealed weapons pursuant to the Firearms Act, G.L. 1956 chapter 47 of title 11. The department, under § 11–47–18(a), is authorized to issue a concealed weapons permit "upon a proper showing of need." According to plaintiffs' complaint, Mosby sought a permit because he is a gun collector who sometimes travels with large amounts of money. Golotto, a self-employed shopkeeper, submitted his application because he also travels with large amounts of money and is concerned about the number of robberies in the area where his shop is located.

The department reviewed and denied Mosby's and Golotto's applications by separate letters dated March 25, 1999, and April 29, 1999, respectively. Both denial letters said: "The Department * * * has determined insufficient need to issue a permit for you to carry a concealable weapon as defined in § 11–47–18 of the General Laws of Rhode Island, as amended." Neither letter mentioned the possibility of meeting with the department to contest the denials. However, at Mosby's request, he and his attorney met with former Chief of the Rhode Island Bureau of Criminal Identification, Vincent McAteer (Chief McAteer), to discuss the reasoning behind the rejection. After the meeting, Chief McAteer affirmed his rejection. Golotto never spoke with anyone at the department about the denial of his application.

In June 1999, the department first promulgated a document setting forth its guidelines for reviewing applications to obtain a permit under the Firearms Act. At the time plaintiffs submitted their applications, the department had no written guidelines explaining the application process or the criteria used to review applications. The plaintiffs' applications were judged based on an unpublicized standard, under which individual applications were considered on a case-by-case basis. Decisions of the department were made based upon whether the applicant had demonstrated "an articulable risk" to his life or property and whether the applicant could change his lifestyle to prevent the need for a permit.

The plaintiffs brought the instant suit in Superior Court, arguing that the department's denial of their original applications violated the APA and their civil rights as guaranteed under the Rhode Island Constitution. Consequently, plaintiffs sought a declaratory judgment or a writ of mandamus ordering that the licenses be issued. Alternatively, plaintiffs asked the department to (1) conduct a hearing on their

applications, (2) provide written copies of the rules, procedures and standards that the department used to review applications for licenses, and (3) pursuant to the APA, promulgate rules applicable to applications to carry concealed weapons filed under § 11–47–18.

The department moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. The hearing justice determined that the APA did not vest the Superior Court with subject-matter jurisdiction to review the department's decision because the application process under § 11–47–18 was not a contested case. Consequently, the hearing justice granted the department's motion to dismiss.

The plaintiffs appealed to this Court, and the parties were directed to appear and show cause why the issues raised in the appeal should not summarily be decided. After hearing oral arguments on October 1, 2002, this Court concluded that cause had been shown and, because of the importance of the issues raised in the appeal, that further briefing and argument would be appropriate. We also invited the

public to submit *amicus curiae* briefs discussing the issues in the case. Many organizations accepted our invitation, and we gratefully acknowledge their memoranda.[2]

## II

### Appellate Filing Fees

We begin by addressing a procedural problem affecting Golotto's appeal. The notice of appeal, filed on February 9, 2001, named both plaintiffs and was signed by their attorney. However, our records indicate that only one filing fee was tendered.[3]

■ Although Article I, Rule 3(b) of the Supreme Court Rules of Appellate Procedure allows two parties to file a joint notice of appeal, pursuant to Rule 5(a), each is required to pay the prescribed $150 filing fee. This Court repeatedly has held that the "[f]ailure of a party to tender the requisite fee renders its appeal invalid." *Kirby v. Planning Board of Review of Middletown*, 634 A.2d 285, 288 (R.I.1993); *see also Tateosian v. Celebrity Cruise Services, Ltd.*, 768 A.2d 1248, 1249 n. 1 (R.I. 2001). Our records reveal that, of the two plaintiffs, the only name written on the

**2.** The Citizens' Rights Action League, the Rhode Island Affiliate of the American Civil Liberties Union, the Brady Center to Prevent Gun Violence, the Rhode Island Police Chiefs Association, the Rhode Island Chapter of the Million Mom March, the National Rifle Association of America, Inc., the Rhode Island State Rifle & Revolver Association, and the Violence Policy Center have submitted *amicus curiae* briefs. Many of the arguments presented by the *amici* support each party's position in one respect or another.

**3.** After we ordered full briefing and argument, Golotto not only failed to pay the filing fee, but also elected not to file a brief. After the second oral argument, when it was again pointed out to counsel that Golotto was not properly before the Court, counsel simply forwarded a check to the clerk with instructions that she "bring this to the Court's attention as this matter is currently under deliberation."

In an order dated December 15, 2003, we rejected Golotto's tender as having been untimely filed pursuant to Article I, Rule 4(a), of the Supreme Court Rules of Appellate Procedure, which requires a notice of appeal and a filing fee to be submitted "within twenty (20) days of entry of the judgment, order, or decree appealed from." Justice Flanders dissented to this order. However, after this appeal was argued to the Court for the second time, counsel simply forwarded a check and made no attempt to explain his failure to pay the filing fee. Although the dissent correctly notes that failure to pay the filing fee is fatal to an appeal, it faults the Court for not "giving him an opportunity to show excusable neglect" before dismissing the appeal. The travel of this case demonstrates otherwise. Golotto's appeal was not appropriately before the Court and Mosby is the only appellant.

receipt issued by the Superior Court clerk's office is Mosby's. Thus, we conclude that the only fee tendered in this case was on his behalf. Consequently, Golotto is not a party to this appeal.

## III

### Subject–Matter Jurisdiction

■ The hearing justice dismissed Mosby's case for lack of subject-matter jurisdiction under the APA. The APA's judicial review provision provides that: "[a]ny person who has exhausted all administrative remedies available to him within the agency, and who is aggrieved by a final order in a *contested case* is entitled to judicial review under this chapter." Section 42–35–15(a). (Emphasis added.) The APA defines a contested case as "a proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing." Section 42–35–1(c).

The hearing justice considered whether the department's decision on Mosby's application must be made "after an opportunity for hearing" under two theories. Under the first, he considered whether the denial of Mosby's application infringed on his right to keep and bear arms as provided by art. 1, sec. 22, of the Rhode Island Constitution. If so, the argument goes, then the Due Process Clause of the Fourteenth Amendment to the United States Constitution would require that Mosby be afforded a hearing on his application. Alternatively, the hearing justice considered whether there is an implicit hearing requirement in the Firearms Act. We address each issue *seriatim.*

### A

### Due Process

"The Due Process Clause applies when government action deprives a person of liberty or property * * *." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Protected liberty or property interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *DiCiantis v. Wall,* 795 A.2d 1121, 1126 (R.I.2002) (quoting *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In determining whether a person has a protected liberty or property interest, "we must look not to the 'weight' but to the nature of the interest at stake." *Greenholtz,* 442 U.S. at 7, 99 S.Ct. 2100 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Lynch v. Gontarz,* 120 R.I. 149, 157, 386 A.2d 184, 188 (1978) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. 2701).

The constitutionally protected concept of liberty has not been defined with exactness. "Liberty * * * is a broad concept including not only freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness by a free people." *In re Advisory Opinion to the House of Representatives Bill 85–H–7748,* 519 A.2d 578, 581 (R.I.1987) (citing *Roth,* 408 U.S. at 572, 92 S.Ct. 2701).

■ Only when we conclude that a constitutionally protected interest has been

infringed "[will] we inquire whether the procedures afforded were 'constitutionally sufficient.'" *DiCiantis*, 795 A.2d at 1126 (quoting *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904). When protected interests are implicated, the right of some type of pre-deprivation hearing is paramount. *Lynch*, 120 R.I. at 155, 386 A.2d at 187 (citing *Roth*, 408 U.S. at 569–71, 92 S.Ct. 2701).

## Article 1, Section 22

■■■ We begin by considering whether the constitutional right to keep and bear arms as enumerated in art. 1, sec. 22, of the Rhode Island Constitution is violated by the licensing framework set forth in the Firearms Act. We do so, however, in light of the well established principle that this Court "will refrain from passing on a constitutional question when it is clear that the case before us can be decided on another point and that a determination of such a question is not indispensably necessary for a disposition of the case." *McElroy v. Hawksley*, 97 R.I. 100, 107, 196 A.2d 172, 176 (1963); *see also Rock Ridge Limited v. Assessor of Taxes*, 667 A.2d 778, 780 (R.I.1995) (per curiam). This Court's purpose in construing the Rhode Island Constitution is to effectuate its framers' intent. *See City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I.1995). In doing so, this Court applies the traditional rule of construction that when words in the constitution are unambiguous, they must be given their plain, ordinary and generally accepted meaning. *Id.* "Every clause of the constitution must be given its due force, meaning, and effect, and no word or section can be assumed to have been unnecessarily used or needlessly added." *Id.* "This [C]ourt presumes that the language in a clause was carefully weighed and that the terms imply a definite meaning." *Id.* We also look to the historical context under which art. 1, sec. 22 was adopted, for " 'a page of history is worth a volume of

logic' in determining the extent of state * * * constitutional limitations." *In re Advisory Opinion to the Governor*, 688 A.2d 288, 291 (R.I.1997) (quoting *Kass v. Retirement Board of the Employees' Retirement System*, 567 A.2d 358, 360 (R.I. 1989) and Justice Oliver Wendell Holmes in *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). Whether a particular provision has been amended may give guidance about the intended meaning of an ambiguous provision. *Hometown Properties, Inc. v. Fleming*, 680 A.2d 56, 62 (R.I.1996). Further, "this [C]ourt properly consults extrinsic sources, including the proceedings of constitutional conventions and any legislation related to the constitutional provision that was enacted at or near the time of the adoption of the constitutional [provision]." *Sundlun*, 662 A.2d at 45.

Article 1, section 22 of the Rhode Island Constitution provides that: "[t]he right of the people to keep and bear arms shall not be infringed." By its express terms, it cannot be denied that art. 1, sec. 22 recognizes some form of a right to keep and bear arms. To discern the nature and extent of the right, however, we must look beyond the plain text of that provision.

It seems clear from even a cursory review of the various versions of the right to bear arms, as reflected in the Second Amendment to the United States Constitution and in several state constitutions, that these provisions implicitly, if not explicitly, encompass the concept of "bearing arms" for the common defense.

■■■ This Court has not, before today, had the occasion to interpret the nature of the right provided by art.1, sec. 22. Indeed, the closest we have come to an examination of that section was in *State v. Storms*, 112 R.I. 121, 308 A.2d 463 (1973). In that case, the defendant was convicted

of carrying an unlicensed pistol. In dicta, we noted that, if the defendant relied on art. 1, sec. 22 to challenge his conviction,

"he would have been burdened with persuading us of the weakness of what is apparently the prevailing view, viz., that a constitutional guarantee to keep and bear arms is not infringed upon by legislation which, in broad terms, forbids the unlicensed carrying of a pistol or revolver upon one's person excepting only in his home and place of business or upon his land." *Storms*, 112 R.I. at 123, 308 A.2d at 464 (citing *Burton v. Sills*, 53 N.J. 86, 248 A.2d 521 (1968) and *Matthews v. State*, 237 Ind. 677, 148 N.E.2d 334 (1958)).

As we discuss *infra*, based on the text, structure and history of the constitution, we hold that art. 1, sec. 22 provides individuals with a right to keep and bear arms, subject, however, to reasonable regulation by the state in exercising its police power.

The constitutional right to bear arms derives from section 7 of the English Bill of Rights: "the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." Thus the law permitted persons of certain rank, or property, (notably Protestants) to keep a firearm. Akhil Reed Amar, *Response: An(other) Afterword on the Bill of Rights*, 87 Geo. L.J. 2347, 2360–61 (1999) (quoting section 7 of the English Bill of Rights of 1689).

The English Bill of Rights, the precursor to our own Bill of Rights, was adopted in response to the abuses and oppressions of King James II, among which were " 'raising and keeping a standing Army within this Kingdom in time of Peace without consent of Parliament, and Quartering Soldiers contrary to Law' "; and " 'causing several Good Subjects being Protestants to be Disarmed at the same time, when papists were both Armed and Imployed con-

trary to Law.' " H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 Chi.-Kent L. Rev. 403, 460 (2000).

These long-held beliefs against official oppression survived the colonization of North America and became bedrock principles for our fledgling nation, particularly its thirteenth state. The right to keep and bear arms has been of paramount concern to Rhode Islanders for more than two centuries. When ratifying the United States Constitution in 1790, this state's delegates proclaimed "[t]hat the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing arms, is the proper, natural and safe defence of a free state." Ratification of the United States Constitution, pt. XVII (Newport, May 29, 1790). The delegates made this declaration even though the United States Constitution, in its original form, contained no comparable provision. Only when the Bill of Rights was adopted in 1791 did the United States Constitution specifically recognize a right to bear arms under the Second Amendment.

The Second Amendment to the United States Constitution provides: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." Because plaintiffs' claim is grounded on the Rhode Island Constitution rather than the United States Constitution, we need not join the heated debates over the origins and proper interpretation of the Second Amendment. *See, e.g., Silveira v. Lockyer*, 312 F.3d 1052, 1086 (9th Cir.2002) ("Text, History, and Precedent All Support the Collective Rights View of the Amendment"); *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir.2001) ("Second Amendment protects individual

rights"). It is sufficient to note the United States Supreme Court's observation that "[t]he sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion." *United States v. Miller,* 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Indeed, the Supreme Court has held that the right to keep a particular weapon unrelated to the "preservation or efficiency of a well regulated militia" is not guaranteed under the Second Amendment. *Id.* at 178. Rather, the role of the Second Amendment is clear: "[t]his is one of the amendments that has no other effect than to restrict the powers of the National government * * *." *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886).

It has been said that the United States Supreme Court's interpretation of the Second Amendment supports a "collective rights" theory, which "guarantees the right of the people to maintain effective state militias, but does not provide any type of individual right to own or possess weapons." *Silveira,* 312 F.3d at 1060, 1066 n. 16. Many courts and academics have argued strenuously over the wisdom of such a view. Under the countervailing "individual rights" theory, a right to keep and bear arms, in one form or another, is given to individuals irrespective of a militia connection. *Id.* at 1060.

Rhode Island, despite gaining its independence in 1776, did not operate under a state Constitution until 1842.[4] This Constitution was enacted following Dorr's Rebellion, a revolt against Rhode Island's aristocratic and undemocratic government. David B. Kopel, *What State Constitutions*

*Teach About the Second Amendment,* 29 N. Ky. L. Rev. 827, 845 (2002). Despite its creation in the aftermath of what the constitutional framers most certainly considered an "illegitimate armed insurrection," *id.,* art. 1, sec. 22 explicitly proclaimed that "[t]he right of *the people* to keep and bear arms shall not be infringed." (Emphasis added.)

Important to our holding today is the use of the phrase "the people," which is not unique to art. 1, sec. 22. The preamble to the Rhode Island Constitution states, "We, the people of the State of Rhode Island and Providence Plantations * * * do ordain and establish this Constitution of government." Article 1, section 2 recognizes that "All free governments are instituted for the protection, safety, and happiness of the people." In article 1, section 6, the framers assure that "the people" will be protected from unreasonable searches and seizures. Section 17 of article 1 secures the right of "[t]he people" to exercise their "rights of fishery, and the privileges of the shore." This Court has held that "the term 'people,' as used in the Constitution, is broad and comprehensive, comprising in most instances all the inhabitants of the State." *In re Incurring of State Debts,* 19 R.I. 610, 613, 37 A. 14, 15 (1896).

■ There is no indication that the framers of the Rhode Island Constitution intended to attribute a restricted meaning to the phrase "the people" in art.1, sec. 22. Accordingly, we attribute the ordinary meaning to the phrase "the people;" *i.e.,* that it includes all inhabitants of the state. Thus, like the right to be free from unreasonable searches and seizures and other rights provided to "the people," we believe

---

**4.** The Rhode Island Constitution was ratified in November 1842 and came into effect in May 1843.

that the right provided in art. 1, sec. 22 flows to the people individually.

We now must consider what the right to "keep and bear" arms entails. We are of the opinion that the "keeping" and "bearing" of arms involve different concepts. So holding, we are able to attribute significance to both of the terms use in that phrase. *See Sundlun*, 662 A.2d at 45 (noting that constitutional terms imply a definite meaning).

Just two years before the Rhode Island Constitution was ratified, the Supreme Court of Tennessee explained the significance of the phrase "bear arms" as it was used in that state's constitution. In *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840), the defendant was convicted of carrying a concealed knife in public in violation of state law. The court rejected the defendant's contention that the statute under which he was convicted violated his rights guaranteed by the Tennessee Constitution. At that time, article 1, section 26, of the Tennessee Constitution declared " 'That the free white men of this State, have a right to keep and bear arms for their common defence.' " *Aymette*, 21 Tenn. at 156. The court held that the phrase "bear arms" "has a military sense, and no other * * *." *Id.* at 161. As the court artfully described "A man in pursuit of deer, elk and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had *borne arms * * *.*" *Id.*

The Ninth Circuit has also offered its interpretation of the phrase "bear arms." *See Silveira*, 312 F.3d at 1072. Focusing on the second clause of the Second Amendment, the court noted that "the phrase 'bear arms' is a phrase that customarily relates to a military function." *Id.* Reviewing considerable research on the subject, the court was convinced that "the use of the term 'bear arms' generally referred to the carrying of arms in military service—not the private use of arms for personal purposes." *Id.*

The Fifth Circuit, however, reached the opposite conclusion in interpreting the same "bear arms" language of the Second Amendment. In *Emerson*, 270 F.3d at 231–32, the court held the Second Amendment's use of the phrase "bear arms" also refers to the carrying of arms by a civilian.

Both the Fifth and Ninth Circuits relied on persuasive historical evidence in reaching their divergent conclusions about the meaning of the word "bear." [5] Indeed, both courts marshaled an impressive array of writings to support their respective positions. For purposes of interpreting the Rhode Island Constitution, however, we find it noteworthy that both courts looked to a page in Rhode Island history to find evidence of the military connotation of the phrase "bear arms." Specifically, they cited to the Rhode Island ratification of the United States Constitution. *Silveira*, 312 F.3d at 1074 n. 31; *Emerson*, 270 F.3d at 230 n. 28. The Rhode Island delegates, in addition to their suggested precursor to the Second Amendment described above, declared that "any person religiously scrupulous of bearing arms, ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead." Ratification of the United States Constitution, pt. XVIII. It is clear that this conscientious objector provision and its reference to "bear arms" relates exclusively to military service.

5. Although both decisions interpret the term as it is used in the United States Constitution and would not be binding on this decision, they do provide probative discussions of the history of the term as it is used in a constitutional sense generally.

■ Accordingly, we are satisfied that Rhode Island's historical use of the phrase "bear arms" in connection with the ratification of the United States Constitution, relates to military service and the common defense. This implied relationship between the bearing of arms and military service, however, does not undermine the individual right to "keep" arms in one's home or in his or her place of business. It is the keeping of arms that is the *sine qua non* of the individual right under art. 1, sec. 22.

Although the right to bear arms was related to bearing for purpose of the militia, the militia was composed of individuals, "civilians primarily, soldiers on occasion." *Miller*, 307 U.S. at 179, 59 S.Ct. 816. History reveals that the policy of Rhode Island called for individuals to keep arms to defend the state "when the alarm sounds." Stephen P. Halbrook, *A Right to Bear Arms* 102–03 (Greenwood Press 1989). Indeed, the Militia Act of 1798 provided that a member of the militia must "provide himself with a good musket or firelock," powder and ammunition. An Act to organize the Militia of this State, P.L. 1798, § 1 at p. 423–24. "The horseman was to furnish himself with a pair of pistols and a saber." Halbrook, at 103 (citing the Militia Act, of 1798, p. 426). Every member of the "Senior Class," which comprised people exempt from militia service, was expected to "provide himself with arms and accoutrements, in like manner as the members of the militia * * * and shall be liable to be called out in case of the invasion of the State." An Act to establish the Senior Class, P.L. 1798, §§ 1, 3 at p. 442–43. To deny the people their individual right to keep appropriate arms could transform the militia into a toothless tiger. In the absence of an individual right to keep arms, the government could, by legislative act, deprive the people of their right to defend the state.

Legislation enacted just after the Rhode Island Constitution was ratified sheds further light on our interpretation of art.1, sec. 22. In section 36 of the 1843 Rhode Island Acts and Resolves concerning Militia Law, the General Assembly provided that "[e]ach chartered regimental company of light infantry, grenadiers, and riflemen, raised at large, shall be furnished with muskets or rifles, and every such company of cavalry, with sabres, belts, and pistols * * *." Those arms could be delivered to the company "for the safe *keeping* * * * [provided there is] satisfactory evidence that a suitable armory or place of deposite for such muskets or rifles has been provided * * * which arms so furnished shall be carefully *kept* for the use of such company for military purposes only." *Id.* (Emphasis added.) This statutory language indicates that the keeping of arms contemplates storage in an appropriate location rather than carrying the same in public.

We discern no jurisprudential support in this state for the dissent's conclusion that the term "bear arms" extends beyond the military context. The fact that the terms "bearing arms" and "arms-bearing activity" have found their way into two recent opinions of this Court—both authored by the dissent and issued *after* this case was first argued and placed on the full argument calendar—is of no moment to this appeal. The Supreme Court does not decide constitutional issues by reference to adverbial phrases that are, at best, dicta. What is of significance, however, is that in the one-and-one-half-plus centuries since the Rhode Island Constitution was adopted, no other Rhode Island jurist in any opinion ever has referred to the possession of a firearm, particularly during the commission of murder, as "arms-bear-

ing activity." [6]

Although we conclude that the "bear arms" language of art. 1, sec. 22 is employed in the military context, we also recognize an individual right flowing to the people to keep and bear arms. However, we are not convinced that resolution of the issues before us today requires us to define the extent of these rights or establish the limits of art. 1, sec. 22 because we are of the opinion that, when viewed in its entirety, the statutory framework under review serves to vindicate an individual's right to keep and bear arms and that the licensing scheme set forth in the Firearms Act is reasonable legislative regulation of weapons that falls squarely within the state's police power.[7]

6. These cases, *Volpe v. Gallagher*, 821 A.2d 699 (R.I.2003) and *State v. McGuy*, 841 A.2d 1109 (R.I.2003), concern the use of a firearm to commit murder criminal behavior that has nothing to do with the right to bear arms and are not relevant to this discussion. In *Volpe*, 821 A.2d at 703, a mentally ill man shot his unsuspecting neighbor three times in the head and body with a *shotgun;* his homeowner-mother was held responsible for the wrongful death, *id.* at 718, because she negligently allowed her son to "keep and store guns and ammunition on her property." In *McGuy*, we noted that the victim of a second-degree murder had engaged in "gun-toting conduct," but held that the behavior was not sufficiently threatening "to allow defendant to preemptively pull out his gun and shoot [him] to death." *McGuy*, 841 A.2d at 1114. Accordingly, these are criminal cases that tragically resulted in death; they have no relevance to the right to keep and bear arms. Indeed, in *Volpe*, the weapons were kept at the assailant's home, a situation far removed from the issues facing us today.

7. We disagree with the dissent's assertions about the law of self-defense in Rhode Island as it relates to deadly force. Neither of the two opinions from the nineteenth century cited by the dissent involved a firearm. *State v. Ballou*, 20 R.I. 607, 40 A. 861 (1898) and *State v. Sherman*, 16 R.I. 631, 18 A. 1040 (1889). In this state, one is not entitled to "stand his ground, and if need be, kill his assailant" with a handgun unless unable to retreat and faced with deadly force. *Sherman*, 16 R.I. at 633, 18 A. at 1041. The law of self-defense is well-settled; it is grounded on necessity and includes the doctrine of retreat. Rather than "stand[ing] his ground," before one may employ *deadly force*, he or she must retreat "when an open, safe avenue of escape is available and he [or she] is consciously aware of this fact." *State v. Guillem-et*, 430 A.2d 1066, 1069 (R.I.1981); *see also State v. Rieger*, 763 A.2d 997, 1002–03 (R.I. 2001). A person may stand his ground and not retreat *only* if he employs less than deadly force against the assailant. *Guillemet*, 430 A.2d at 1069. Obviously, this has no relevance to firing a loaded revolver. There are long-standing and well recognized limits on the amount of force one can lawfully employ in self-defense:

> "The law concerning self defense in Rhode Island permits persons who believe that they are in imminent peril of bodily harm to use such *nondeadly* force as is reasonably necessary in the circumstances to protect themselves." *State v. Quarles*, 504 A.2d 473, 475 (R.I.1986) (citing *State v. Tribble*, 428 A.2d 1079, 1082 (R.I.1981)). (Emphasis added.)
>
> "Before resorting to the use of deadly force, the person attacked *must* attempt retreat if he or she is consciously aware of an open, safe, and available avenue of escape." *Id.* (citing *Guillemet*, 430 A.2d at 1069). (Emphasis added.)

Clearly, notwithstanding the century-old opinions cited by the dissent, with respect to the use of deadly force (with a handgun), one may not "stand his or her ground 'and if need be kill his [or her] assailant.' " Nothing in the law of self-defense in any way has an impact upon the "right of the people to keep and bear arms." Simply put, the Legislature, in its duty to act in the public's welfare and to exercise its police power, has determined that a limited class of firearms, pistols and revolvers, may not be carried outside one's home, place of employment or on one's property without a license.

The Castle Doctrine is a recognized exception to the duty to retreat before one may employ deadly force to repel an attack, and has both statutory and common-law origins. Pursuant to G.L.1956 § 11–8–8, an owner,

[14] Numerous jurisdictions have recognized that the constitutional right to keep and bear arms under a state constitution is not absolute and that reasonable regulatory control by the Legislature to promote the safety and welfare of its citizens uniformly has been upheld. "That the right to bear arms is not an unlimited right and is subject to reasonable regulation is an accepted principle among other jurisdictions." *Arnold v. City of Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163, 172 (1993). *Accord People v. Blue,* 190 Colo. 95, 544 P.2d 385, 390–91 (1975); *State v. Rupp,* 282 N.W.2d 125, 130 (Iowa 1979); *In re Atkinson,* 291 N.W.2d 396, 399 (Minn.1980); *State v. Angelo,* 3 N.J.Misc. 1014, 130 A. 458, 459 (N.J.Sup.1925); *State v. Dees,* 100 N.M. 252, 669 P.2d 261, 264 (Ct.App.1983); *State v. Buckner,* 180 W.Va. 457, 377 S.E.2d 139, 146 (1988) (citing *Bristow v. State,* 418 So.2d 927, 930 (Ala.Crim.App.1982) (right to bear arms is not absolute and is subject to reasonable regulation)); *State v. McAdams,* 714 P.2d 1236, 1237 (Wyo.1986); *Carfield v. State,* 649 P.2d 865, 871 (Wyo.1982). "[T]he right to keep and bear arms is not absolute; * * * 'regardless of the basis of the right to bear arms, the State, nevertheless, has the power to reasonably regulate it.'" *State v. Ricehill,* 415 N.W.2d 481, 483 (N.D.1987) (quoting *People v. Brown,* 253 Mich. 537, 235 N.W. 245, 246 (1931)). Because the right to keep and bear arms is not absolute there is no "constitutional right to carry loaded weapons at all times and in all circumstances." *State v. Warren,* 975 P.2d 900, 902 (Okla.1998).

Even in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test—"the proper question is whether the statute is a reasonable exercise of police power." *State v. Cole,* 264 Wis.2d 520, 665 N.W.2d 328, 337 (2003). Although deferential, this standard of review is "generally distinct from the type of review that challenges under other constitutional rights receive." *Id.* (quoting Jeffrey Monks, Comment, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 259 (2001)). The test for determining the constitutionality of a ban on handguns is whether the enactment is reasonable, that is whether the statute is a reasonable limitation of the right to bear arms, rather than a reasonable means of promoting the public welfare. *Cole,* 665 N.W.2d at 338.

Recently, the state of Connecticut, in upholding a statutory ban on assault weapons, concluded that the regulation did not infringe on the right to keep and bear arms guaranteed by the Connecticut Constitution because that state's law "continue[d] to permit access to a wide array of weapons." *Benjamin v. Bailey,* 234 Conn. 455, 662 A.2d 1226, 1235 (1995). Accordingly, we are of the opinion that the right to possess a handgun, whether a fundamental liberty interest or not, is not absolute and is subject to reasonable regulation. We are further satisfied that the

---

tenant, or other occupier of premises has no duty to retreat and may use deadly force to repel an attack by a person engaged in the commission of a crime. Further, "one need not retreat from [his or her] place of dwelling before using deadly force to repel an assailant." *State v. Fetzik,* 577 A.2d 990, 994 (R.I. 1990). This exception to the Doctrine of Re-

treat is not available to repel an attack by a co-tenant or roommate and one must attempt to retreat in the face of a deadly attack by a co-occupant. *Quarles,* 504 A.2d at 476. Of course, neither of these exceptions is relevant to the right to keep and bear arms because one has an absolute right to keep firearms in one's home or place of business.

statute under review, § 11–47–18, is a restriction on the type of firearms one may lawfully possess but not a total ban on the right to bear arms.

## The Firearms Act

■ When passing upon the constitutionality of enactments of the General Assembly, in light of the "broad plenary power of the General Assembly, this [C]ourt's evaluation of legislative enactments has been extremely deferential; * * * we have interfered with such enactments only when the legislation at issue could palpably and unmistakably be characterized as an excess of legislative power." *Sundlun,* 662 A.2d at 44–45. "In interpreting the scope of a grant of power made by the General Assembly, we carefully consider the legislation in its entirety along with the circumstances that motivated its passage." *Pontbriand v. Sundlun,* 699 A.2d 856, 866 (R.I.1997) (citing *Brennan v. Kirby,* 529 A.2d 633, 637 (R.I.1987)). Our task is to evaluate the constitutional issues presented and "if two alternate interpretations are possible, we shall favor that which presents no potential constitutional difficulties." *Id.* (citing *Kass v. Retirement Board of Employees' Retirement System,* 567 A.2d 358, 360 (R.I.1989)); *see also Rhode Island State Police v. Madison,* 508 A.2d 678, 683 (R.I.1986). We begin with the well established principle that a statute is presumed to be valid and constitutional, *Sundlun,* 662 A.2d at 45, and the party challenging its constitutionality bears the burden of convincing this Court beyond a reasonable doubt that the enactment violates the state or federal constitution. *Seibert v. Clark,* 619 A.2d 1108, 1113 (R.I.

1993); *see In Re Christopher S.,* 776 A.2d 1054, 1057 (R.I.2001) (citing *In Re Advisory Opinion to the Governor,* 659 A.2d 95, 100 (R.I.1995)).

A careful review of the Firearms Act in its entirety reveals an orderly statutory scheme designed to regulate the possession and use of an array of weapons, including pistols, rifles and other deadly weapons. Besides banning the unlicensed possession of a firearm, the Firearms Act embraces a host of weapons and activities. Under its provisions a person convicted of a crime of violence or a felony is precluded from possessing a firearm [8] and a person who commits a crime of violence while armed with a firearm is guilty of a felony subject to a mandatory period of incarceration.[9] *See State v. Rodriguez,* 822 A.2d 894, 905, 907–08 (R.I.2003) (no double jeopardy bar to sentencing a defendant for the crime of use-of-a-firearm and committing a crime of violence, namely, murder, while armed with a firearm because, *inter alia,* the Legislature specifically has authorized a criminal sentence consecutive to the underlying violent felony). Further, "person[s] who [are] under guardianship or treatment or confinement by virtue of being a mental incompetent," a drug addict or a drunkard may not own or possess any firearm;[10] nor may an illegal alien own a firearm.[11] It is unlawful for anyone in Rhode Island, whether licensed or exempt from the licensing statute, to carry or transport a firearm while intoxicated or under the influence of narcotics.[12] The Firearms Act prohibits the sale and transfer of any firearm to a minor;[13] nor may one sell or convey any ammunition to a

---

8.  G.L.1956 § 11–47–5.

9.  Section 11–47–3.

10.  Section 11–47–6.

11.  Section 11–47–7.

12.  Section 11–47–52.

13.  Section 11–47–30.

person under eighteen years of age.[14] Anyone convicted of a drug crime while in possession of a firearm, whether licensed or not, is guilty of a felony.[15]

The possession, manufacture and sale of a machine gun is generally prohibited.[16] Likewise, no one may possess or have under his or her control a sawed-off shotgun or sawed-off rifle.[17] It is unlawful to alter the marks of identification on firearms.[18] The sale or possession of a silencer device designed to deaden or muffle the sound of a gunshot is outlawed,[19] as is the manufacture, sale and possession of armor-piercing bullets.[20] No one may possess a bomb or other explosive substance unless specifically authorized to do so by statute.[21]

In addition to the restrictions and prohibitions concerning guns, the Firearms Act outlaws many other weapons—no person may carry or possess a blackjack, slingshot, billy[club], sandclub, sandbag, metal (brass) knuckles, slap glove, bludgeon, stun gun, or any kung-fu weapons. Possession of a dagger, dirk, stiletto, sword-incane, bowie knife or any other knife with a blade measuring more than three inches is also prohibited.[22]

Gun dealers must be licensed by the local authorities and are subject to mandatory restrictions and regulations.[23] The General Assembly has required a seven-day waiting period before one may purchase a pistol or revolver[24] or a rifle or a shotgun[25] and anyone who owns a firearm shall report its loss or theft within twenty-four hours of the discovery of the loss or theft.[26] It is unlawful to fire any firearm in a compact area of any city or town within the state,[27] anywhere within the Blackstone Valley flood plain or marshes,[28] across a public road or street;[29] nor may one carry a loaded rifle or shotgun in a vehicle.[30] Further, every physician who attends or treats a gunshot wound or powder burn, must report the case at once to the local police.[31]

To protect children from negligent gun owners, the Legislature recently has required the safe storage of firearms in the home.[32] Notably, in doing so, the General Assembly declared that its intent was not "to reduce or limit any existing right to purchase and own firearms and/or ammunition" or to "infringe upon the privacy of any family, home or business except by lawful warrant."[33] Thus, while attempting to promote greater gun safety in

14. Section 11–47–31.

15. Section 11–47–8(c).

16. Section 11–47–8(a).

17. Section 11–47–8(b).

18. Section 11–47–24.

19. Section 11–47–20.

20. Section 11–47–20.1.

21. Section 11–47–21.

22. Section 11–47–42(a)(1).

23. Section 11–47–38.

24. Section 11–47–35.

25. Section 11–47–35.2.

26. Section 11–47–48.1.

27. Section 11–47–50.

28. Section 11–47–49.1.

29. Section 11–47–49.

30. Section 11–47–51.

31. Section 11–47–48.

32. Section 11–47–60.1.

33. Section 11–47–60.1(a).

the home, the General Assembly carefully has avoided any restriction on gun ownership by a homeowner or landowner. Additionally, retail dealers are now required to provide a trigger lock or other safety device before a pistol is delivered to a purchaser.[34] Finally, in response to the explosion of gun violence, particularly in Providence,[35] the General Assembly has provided for stiff penalties for anyone convicted of a "drive-by" shooting[36] or who possesses a firearm on school grounds.[37] Clearly, the regulation of weapons falls within the police power of the General Assembly and is both reasonable and necessary. A statute that vests the department with discretionary authority to issue a gun permit "upon a proper showing of need," § 11–47–18, is part of this comprehensive scheme and does not unconstitutionally infringe on "[t]he right of the people to keep and bear arms." R.I. Const. art. 1, sec. 22.

### Gun Permits in General

Two separate and distinct licensing procedures are set forth in the Firearms Act: § 11–47–18, now before the Court, provides for the discretionary grant of a firearms license by the department "upon a proper showing of need," and § 11–47–11(a), a mandatory licensing provision that provides in pertinent part:

"The licensing authorities of *any* city or town *shall,* upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age

or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed." (Emphases added.)

■ Because the Firearms Act provides for both discretionary and mandatory licensing to qualified applicants, the constitutional guarantee to keep and bear arms is fulfilled. Mosby, a resident of Massachusetts who holds several gun licenses from other states, was entitled to a carrying permit from the licensing authority of any city or town. An avid gun collector, plaintiff has a proper reason for carrying a pistol or revolver and there is no suggestion that he is an unsuitable person. In contrast to § 11–47–18, the statute now before the Court, § 11–47–11 is mandatory—an applicant who meets the criteria set forth in § 11–47–11 is entitled to a gun permit. *See Schubert v. DeBard,* 398 N.E.2d 1339, 1341 (Ind.Ct.App.1980) ("[I]f it is determined * * * that the applicant has met the conditions of the statute, the [licensing authority] has no discretion to withhold the license."). Although we are mindful that the "suitable person" provision in § 11–47–11 vests the local licens-

---

**34.** Section 11–47–60.3.

**35.** According to statistics issued by the United States Department of Justice, the rate of homicides in Rhode Island committed with a gun has been on the increase since 1996. In 1998, 50 percent of the homicides were committed with a firearm, in 1999, 55.6 percent

of homicides were committed with a firearm and this figure increased to 71.1 percent in 2000.

**36.** Section 11–47–61.

**37.** Section 11–47–60.

ing authority with discretion to reject an application filed by an unsuitable person, this leeway does not affect the requirement that the licensing authority *shall* issue a permit to a suitable person who meets the requirements set forth in the statute. The finding that an applicant is a suitable person involves an exercise of discretion, but certain individuals are unsuitable as a matter of law, including convicted felons, habitual drunkards, mental incompetents, illegal aliens, and anyone who has failed to meet the minimum firing qualification score.[38] Moreover, if a license is refused on the ground that a person is not suitable, this determination is subject to review by this Court on certiorari. *See Krivitsky v. Town of Westerly,* 823 A.2d 1144, 1144 (R.I.2003) ("unless 'a right of appeal is specifically provided by statute,'" the proper procedure for denial by a town council of a license application is by writ of certiorari to the Supreme Court). Because anyone who meets the conditions of § 11–47–11 is entitled to a gun permit, this mandatory requirement supplies the necessary safeguards to the right to bear arms in this state and vindicates the rights set forth in art. 1, sec. 22, of the Rhode Island Constitution. Thus, the fact that the Firearms Act contains an additional licensing provision by which the department *may* issue a gun permit under certain, more stringent, conditions does not affect our holding. As argued by the state and found by the trial justice, the inclusion of the word "may" in § 11–47–18(a) expressly confers broad discretion upon the department to issue or decline to issue gun permits. This does not, however, have an impact upon "the right of the people to keep and bear arms."

### Discretionary Gun Permits

■ We are of the opinion that the licensing statute now under review is dis-

cretionary. Significantly, for purposes of a constitutional liberty-interest analysis, § 11–47–18 vests the department with extremely broad discretion to grant or deny a license even when there has been "a proper showing of need." Many courts, when confronted with a discretionary licensing statute, decline to construe a protected liberty interest in obtaining a license. *See Gonzales v. Commissioner, Department of Public Safety,* 665 A.2d 681, 683 (Me.1995) (no constitutionally protected property interest in obtaining a gun permit when there is broad discretion to withhold the license). Likewise in *Gifford v. City of Los Angeles,* 88 Cal.App.4th 801, 106 Cal.Rptr.2d 164, 168–69 (2 Dist.2001), the California Court of Appeals concluded that mandamus does not lie when a state statute grants broad discretion to the licensing authority to issue or refuse to issue a firearms license upon a "showing of good cause." In *Erdelyi v. O'Brien,* 680 F.2d 61 (9th Cir.1982), the Ninth Circuit Court of Appeals concluded that "[w]here state law gives the issuing authority broad discretion to grant or deny license applications in a closely regulated field, initial applicants do not have a property right in such licenses [that is] protected by the Fourteenth Amendment." *Id.* at 63 (citing *Jacobson v. Hannifin,* 627 F.2d 177, 180 (9th Cir.1980)).

Accordingly, because the statute under consideration vests the Attorney General with discretion to refuse a license even if a person makes "a proper showing of need," we are of the opinion that it has no impact on any constitutionally protected liberty interest, nor are we persuaded that the refusal of the Attorney General to issue a permit under the provisions of § 11–47–18 violates the "right of the people to keep and bear arms."

---

**38.** *See* §§ 11–47–5, 11–47–6, 11–47–7, and 11–47–15.

■ Consequently, although the Firearms Act regulates and prohibits the ownership and possession of numerous weapons, including handguns, the statute includes both mandatory and discretionary licensing provisions that satisfy the constitutional guarantee to keep and bear arms. The citizens of this state are free to possess a rifle or a shotgun, or a pistol or revolver in their homes, places of employment and on their property. Therefore, due process concerns are not triggered and Mosby is not entitled to a hearing on his initial application filed under § 11–47–18(a).[39]

### Implicit Hearing Requirement Under § 11–47–18

■ Alternatively, Mosby argues that § 11–47–18 requires a hearing on his application. A hearing is required by law for purposes of the APA if one is provided for in the statute under which a plaintiff submits an application. *See Bradford Associates v. Rhode Island Division of Purchases,* 772 A.2d 485, 489 (R.I.2001) (citing *Property Advisory Group, Inc. v. Rylant,* 636 A.2d 317, 318 (R.I.1994)). In *Bradford,* we held that a failure to expressly provide for a hearing by statute renders a case "uncontested" for purposes of the APA. *Id.*

■ Mosby acknowledges that § 11–47–18 does not expressly provide for a hearing, but argues that one is implicitly required under the statute. To support his argument, Mosby cites *Colonial Hilton Inns of New England, Inc. v. Rego,* 109 R.I. 259, 284 A.2d 69 (1971). In that case, this Court considered whether a hearing was required to review an application to fill submerged lands filed under G.L.1956 § 46–6–2. *Rego,* 109 R.I. at 261–63, 284 A.2d at 70–71. Although § 46–6–2 did not expressly provide for a hearing, we held that such a proceeding was a contested case as defined by the APA because an applicant's " 'rights, duties or privileges' are to be determined." *Id.* at 263, 284 A.2d at 71.

■ An application to carry a concealed weapon filed under § 11–47–18, however, is distinguishable from an application to fill submerged lands filed under § 46–6–2. Section 46–6–2 expressly provides: "that nothing herein contained shall be construed to impair the rights of any riparian proprietors to erect wharves authorized to be erected under any of the laws establishing harbor lines within the state or otherwise by the [G]eneral [A]ssembly." Impairment of a riparian owner's rights authorized by the General Assembly is a deprivation of a state-created interest. *See Hamilton v. Myers,* 281 F.3d 520, 529–30 (6th Cir.2002) (acknowledging that riparian rights should be protected by procedural due process). Thus, procedural due process would call for a hearing to determine whether the state's decision to deny an application would impermissibly impair a riparian owner's rights.

Conversely, § 11–47–18 contains no analogous limitation on the licensing of individuals to carry concealed weapons. Unlike § 46–6–2, § 11–47–18 does not im-

---

**39.** We note that a different result may be reached if the Department sought to discontinue or revoke a permit that already had been obtained. *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("There is a crucial distinction between being deprived of a liberty one has * * * and being denied a conditional liberty one desires."). Also, in ruling that the denial of Mosby's application filed under § 11–47–18 deprived him of no constitutionally protected rights, we offer no opinion as to how a similar case would be analyzed upon a rejection of an application filed under § 11–47–11.

pose an express limitation on the department's decision-making authority. Thus, § 11–47–18 does not implicitly require a hearing, and filing an application to carry a concealed weapon under that statute does not create a "contested case."

### Required Procedures Under § 11–47–18

■ Although we are satisfied that the licensing scheme set forth in the Firearms Act is both reasonable and lawful, we are mindful that decisions of the Attorney General in licensing matters are not immune from judicial review. As this Court's decision in *Storms* clearly indicates, the Attorney General's role under the Firearms Act is that of a finder of fact, not a master of puppets.

In *State v. Storms*, 112 R.I. 121, 124, 308 A.2d 463, 464 (1973), we considered whether the General Assembly properly delegated a legislative function under the Firearms Act. In holding that the delegation was proper, we looked to the structure and purpose of the act. *Id.* at 125, 128, 308 A.2d at 465, 467. The purpose of the Firearms Act is "to prevent criminals and certain other persons from acquiring firearms generally and handguns in particular without at the same time making unduly difficult such acquisition for other members of society." *Id.* at 127, 308 A.2d at 466. After "establishing primary standards," the General Assembly appropriately delegated to administrative agencies the right to "determine the existence or nonexistence of the facts upon which the enactment is intended to operate * * *." *Id.* at 126, 308 A.2d at 466. To accomplish the purpose of the Firearms Act, the General Assembly established licensing procedures and broad parameters that must be used to guide the licensing body in determining the facts upon which the right to be licensed to carry a handgun hinged. *Id.* at 127, 308 A.2d at 466. Describing those procedures, we noted:

"the Legislature provided that an applicant for a license must show, for example, that he has a 'need' or 'proper reason' for carrying such a weapon, that he is qualified to use it, and that he is an otherwise 'suitable person.' But to make those determinations, calls for an exercise of the fact-finding function which the Legislature obviously is in no position to supply. Hence, to give operative effect to the law and to prevent it from becoming a nullity required a delegation of authority which, in this instance, the Legislature made to those who by reason of their training and experience and the facilities at their command were probably more competent than any others to exercise the delegated power." *Id.* at 127–28, 308 A.2d at 466–67.

■ Having provided adequate guidance to the licensing bodies, it is within the province of the courts to review the licensing decision here to ensure that the General Assembly's intent is being effectuated. The opportunity for judicial review of a licensing body's decision under the Firearms Act is especially important when considering the nature of the right sought to be vindicated through the application process. As a matter of policy, this Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency. Although the court's authority to review the decision is limited, it is not nonexistent. One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon. The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of an unreviewable unrestricted licensing scheme.

Such review is available through a common-law writ of certiorari.

■ To review a decision on certiorari, however, certain procedural steps must be employed to allow a meaningful review by this Court. We previously have conveyed the prerequisites for decisions of administrative agencies acting as fact-finders. In *Dionne v. Jalette,* 641 A.2d 744, 744 (R.I. 1994), we considered the procedure required of a law enforcement committee in finding a former captain of the Woonsocket Police Department guilty of two charges of violating department rules and regulations. We noted that neither this Court nor the Superior Court had the power to make findings of fact in these matters. Judicial review of the committee's conclusion "is limited to determining whether there is evidence in the record to support its findings. The hearing panel must, at a minimum, indicate the evidence upon which it relies." *Id.* at 745.

Notwithstanding our previous decisions declaring that there is neither a constitutional entitlement to parole nor a right to a parole-determination hearing, even the Rhode Island Department of Corrections (DOC) must provide the basis for its decisions in the inmate classification context. In *DeCiantis v. Rhode Island Department of Corrections,* 840 A.2d 1090, 1092–93 (R.I.2003) (per curiam), we noted that "although the DOC director has unfettered discretion concerning classification determinations, when he or she exercises that discretion, an inmate is entitled to know the reasons upon which that decision is based." The same logic applies in the gun-permitting context, especially when, as here, the Department's determination is subject to certiorari review.

■ We hold that the Attorney General must adhere to minimum procedural requirements when rejecting an application filed under § 11–47–18. A re-jected applicant is entitled to know the evidence upon which the department based its decision and the rationale for the denial. Armed with this information, an aggrieved applicant can petition this Court for a writ of certiorari so that we may review the department's decision for error of law. In conducting such a review, this Court will not weigh the evidence nor substitute its judgment for that of the fact finder. *See State v. DeCiantis,* 813 A.2d 986, 988 (R.I.2003); *State Department of Environmental Management v. State Labor Relations Board,* 799 A.2d 274, 277 (R.I.2002). Rather, we will inspect the record to determine whether the department's findings are supported by any legally competent evidence. *Id.* Because Mosby has not sought review by way of certiorari, we cannot review the merits of the department's determination in this case.

## Conclusion

The department's exercise of its broad discretion to deny Mosby's application under § 11–47–18 did not have an impact upon "the right of the people to keep and bear arms." Further, § 11–47–18 does not require a hearing on an individual's application for a gun permit. Based on our decision herein, the decision to grant or deny an application to carry a concealed firearm is not a contested case for purposes of the APA. Accordingly, the Superior Court lacks subject-matter jurisdiction to review the department's decision pursuant to the APA. Rather, the only method to obtain judicial review of a denial of an application filed under § 11–47–18 is to seek a writ of certiorari from the Supreme Court.

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

FLANDERS, J., dissenting.

Since 1843, when the Rhode Island Constitution (constitution) first became effective, the people of this state have enjoyed a constitutionally protected right to keep and bear arms. R.I. Const. art. 1, sec. 22 ("The right of the people to keep and bear arms shall not be infringed."). Despite numerous amendments to and various re-enactments of the constitution, the original wording of the "keep and bear arms" clause has remained unchanged. Until this case, however, the Rhode Island Supreme Court has not been called upon to decide the scope and nature of this right. Nor has the Court previously addressed whether the process (or lack thereof) that the Department of Attorney General (department) used to deny applicants, such as these plaintiffs, licenses to carry concealable handguns infringed upon their state constitutional right to bear arms.

Nevertheless, we know from the text of the constitution that the people's right to keep and bear arms was so important to the framers that they provided that it "shall not be infringed." *Id.* Indeed, this is one of the fundamental rights belonging to the people of this state that our constitution declares to be "essential and unquestionable." *Id.* art. 1, pmbl. The constitution also provides that the people's right to keep and bear arms "shall be established, maintained, and preserved" so that it "shall be of paramount obligation in all legislative, judicial and executive proceedings." *Id.*

When Rhode Island adopted its first constitution in the wake of the unsuccessful Dorr's Rebellion, and fixed in that document the signal importance in this state for the people to keep and bear arms, such a right reflected a long common-law tradition in England and in America acknowledging the importance of an armed populace to the well-being of the individual and to the community at large. *See, e.g.,* 3 Coke, *Institutes of the Laws of England* 161 (1671) ("*Armaque in armatos sumere jura sinunt.*") ("[T]he laws permit the taking up of arms against armed persons.") (translation in Stephen P. Halbrook, *That Every Man Be Armed,* 49 (1984)); 1 William Blackstone, *Commentaries* *140 ("[T]he subjects of England are entitled * * * to the right of having and using arms for self-preservation and defence."). Thus, when arguing on behalf of the British soldiers who were charged with shooting armed colonists in the streets during the Boston Massacre of 1770, John Adams cited Hawkins's *Treatises of the Pleas of the Crown* when he acknowledged that:

> "Here every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence, that distinction is material and must be attended to." 3 *Legal Papers of John Adams* 248 (L. Kinvin Wroth & Hiller B. Zobel, eds., The Belknay Press of Harvard University Press 1965).

According to this tradition, an armed populace was required not only for each individual effectively to serve in the militia for the common defense, but also, when necessary, to exercise his or her natural right of self-defense and to provide a republican counterweight to the omnipresent threat that government rulers exercising arbitrary power would usurp the people's rights and liberties. *See* Robert Dowlut & Janet A. Knoop, *State Constitutions and the Right to Keep and Bear Arms,* 7 Okla. City U.L. Rev. 177, 224 (1982) (citing "the basic historical reasons for a right to arms: (a) the right of personal defense; (b) preference for a militia over a standing army; and (c) the deterrence of government oppression").

Justice Joseph Story of the United States Supreme Court eloquently praised this latter republican purpose of the right to keep and bear arms as the ultimate protection of the citizenry against the omnipresent threat posed by the arbitrary power of rulers and by government usurpation of "the liberties of the republic":

"The right of the citizens to keep and bear arms has justly been considered, as *the palladium of the liberties of a republic*; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." 1 Joseph Story, *Commentaries on the Constitution of the United States* § 1890 at 746 (1833). (Emphasis added.)

In this case, plaintiffs are people.[40] "[T]he term people as used in the [c]onsti-

**40.** Over my dissent, the Court previously rejected plaintiff Steven Golotto's appellate filing fee after his attorney tendered it to the Court on December 8, 2003. Although the failure of an appellant to file a proper notice of appeal in a timely fashion creates a jurisdictional defect that precludes our consideration of the appeal, *see, e.g., Martin v. Lilly*, 505 A.2d 1156, 1159–60 (R.I.1986), the same is not true when an appellant, such as Golotto, files a timely notice of appeal but tenders a late payment of the filing fee. Although the majority correctly notes that an appellant's complete failure to tender the appropriate filing fee will prove fatal to the appeal— " 'payment of the proper fee is a second prerequisite to a valid appeal,' " *id.* at 1160—this Court has held that an appeal may proceed when, as here, an appellant merely has tendered a late payment of the fee. *See, e.g., Reynaud v. Koszela*, 440 A.2d 1308 (R.I.1981) (mem.); *Malinou v. Kiernan*, 121 R.I. 970, 401 A.2d 1313 (1979) (mem.). This accords with the general rule that "a litigant will not be deprived, *ipso facto*, of his appellate remedy because of his failure to comply with some of the procedures required by the rules once the claim of appeal has been timely filed." *Martin v. Estrella*, 107 R.I. 247, 251, 266 A.2d 41, 45 (1970). Also "the [federal] case law indicates that the failure to prepay the statutory filing fee does not constitute a jurisdictional defect." 16A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3949.3 at 57 n. 9 (3d ed. 1999).

In this case, without any motion filed by any party to dismiss Golotto's appeal for failing to file a separate filing fee; without any notice to Golotto to show cause why his appeal should not be dismissed for failing to pay the filing fee in a timely manner; and without giving him an opportunity to show excusable neglect, the majority *sua sponte* rejected his tendered filing fee and dismissed him as a party to this appeal. Given these circumstances, I disagreed with the majority's decision to reject appellant Golotto's late tender of his filing fee and, for that reason, I dissented from the Court's previous order rejecting his late tender. For the same reasons, I would not *sua sponte* have dismissed Golotto as a party to this appeal without at least giving him a chance to show excusable neglect before doing so. Nor would I presume an inability or a failure on his part to do so merely because the Court raised with Golotto's attorney the need for payment of a separate filing fee for each of the two plaintiffs whom he represented when we first heard the case on the show-cause calendar in the fall of 2002. Finally, the majority suggests that "[a]fter we ordered full briefing and argument, Golotto not only failed to pay the filing fee, he elected not to file a brief." In fact, after we ordered full briefing and argument, Golotto paid the filing fee on December 8, 2003. Moreover, Golotto's attorney, who also represented the other plaintiff, Mosby, in this case, previously had filed legal memoranda on both Golotto's and Mosby's behalf on May 18, 2001 (nine page Sup.Ct. R. 12(A) statement), and on December 27, 2001 (twenty-three page supplemental memorandum). After receiving this Court's order assigning this case to the regular, full argument calendar, Mosby's and Golotto's attorney then notified this Court, in writing, on January 16, 2003, that both plaintiffs would rely on their previously filed written submissions to support their appeals. Thus, although both Golotto and Mosby "elected not to file a brief," they did so only after advising us that they intended to rely on their previously submitted legal memoranda that fully briefed the legal issues they raised in their appeals.

tution, is broad and comprehensive, comprising in most instances all the inhabitants of the [s]tate." *In re the Incurring of State Debts*, 19 R.I. 610, 613, 37 A. 14, 15 (1896). The plaintiffs sought to keep and bear arms of a certain type; to wit: pistols and revolvers. Needless to say, pistols and revolvers are among the very core arms that common citizens are apt to carry for their own protection and self-defense, particularly when traveling away from their homes, their property, and their places of business. Nevertheless, state law provided that, for them to carry these firearms beyond their homes, property, or places of business, they had to apply for and obtain a license from the department upon "a proper showing of need" to bear these type of arms, "whether concealed or not." G.L.1956 § 11–47–18(a). Thus, under the statute, the department "may issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person upon a proper showing of need," subject to the applicant presenting certification that he or she is qualified with a pistol or revolver and has paid the requisite licensing fee. *Id.* But the law does not define what constitutes "a proper showing of need."

Indeed, when these plaintiffs applied for a license under § 11–47–18(a), no rules, standards, or guidelines existed for them to know what they had to show by way of "need" to obtain the department's approval of their application. Thus, in practice, the department was free to exercise arbitrary power in passing on such applications: if the department, or any official there who was exercising its licensing authority, arbitrarily believed that the applicant did not need to carry a pistol or a revolver because his or her stated "need" to do so did not rise to a level that the department thought sufficient—or because the department believed that the applicant could change his or her lifestyle to obviate the asserted need to carry such a firearm—then the department could and did deny the application without a hearing and without even explaining why it refused to issue the license.

In my judgment, such an arbitrary licensing scheme was and remains an unconstitutional infringement on the people's fundamental right to bear arms for any lawful purpose and on their equally fundamental right to due process of law whenever the state seeks to deny, abridge, or *infringe upon such a fundamental right.* Indeed, because the right to keep and bear arms is one of the "essential" and "unquestionable" rights and principles that are protected by our state's constitution, I believe that this right constitutes a fundamental liberty interest that is entitled to due-process protection under both state and federal constitutions.

As judges, our job is not to decide whether this constitutional right to keep and bear arms was or remains a good idea; or whether it should enjoy the constitutional status of an essential and unquestionable right. That issue has been decided for us already by the people of this state when they enshrined it in our constitution's "Declaration of Rights" and decided to leave it there for more than 160 years, unamended and unqualified, where it still continues in force to this day.

And certainly our task is not to interpret the constitution in such a way that we rewrite this provision to add exceptions, limitations, and qualifications to a right that the constitution does not except, limit, or qualify. Rather, our paramount job is to protect fundamental constitutional rights and to check the exercise of arbitrary government power. The people secured this fundamental right in our constitution so that it would be protected against

any and all attempts to infringe upon or to abridge it. For our purposes, it matters not whether the infringing acts originate from executive-branch officials, such as the attorney general or any members of that department; from the decisions of judges; from laws passed by the General Assembly; or from the acts of private parties. In short, our overriding charge is to defend constitutionally protected freedoms, such as this one, from any and all forms of encroachment. And in doing so, we should not intrude our own personal views on whether such rights should be enforced, narrowed, expanded, restricted, qualified, infringed upon, or eliminated. Rather, hallowed by "the constitution which at any time exists, till changed by an explicit and authentic act of the whole people," these rights should be enforced because they are "sacredly obligatory upon all." R.I. Const. art. 1, sec. 1. Thus, instead of amending our constitution through judicial interpretation—by hedging about our constitutional rights with restrictions and limiting constructions that are not contained in the constitution itself—we should enforce these rights as they are written until they are amended "by an explicit and authentic act of the whole people." *Id.* Above all else, we must check the exercise of arbitrary government power whenever it threatens to infringe upon such constitutionally protected freedoms. Otherwise, we risk enlistment in what Jefferson called "the subtle corps of sappers and miners constantly working under ground to undermine the foundations" of our fundamental laws.[41]

This is not to say, however, that any and all legislative attempts at reasonable and lawful governmental regulation of the right to keep and bear arms necessarily would infringe upon that right. But in assessing the constitutionality of the department's administration of this legislation, it is important to emphasize that pistols and revolvers are not sawed-off shotguns or assault rifles. On the contrary, these small arms are among those core weapons that ordinary, law-abiding citizens are most likely to bear when attempting to provide themselves with some measure of personal security—especially when they are away from home and attempting to defend their very lives and their property in the exercise of their constitutionally protected right to do so. They are *not*, in other words, the type of weaponry—such as sawed-off shotguns and assault rifles—that is more typically associated with criminal activity and lawless behavior and, thus, more readily subject to prohibitory government regulation.

Moreover, preventing certain unfit or unsuitable individuals from bearing concealable arms—such as convicted felons, the insane, children, or those untrained for or incapable of bearing arms—would not amount to an infringement of the people's right to keep and bear arms because, in the interest of the public health, safety, and welfare, states traditionally have barred these individuals from accessing arms without violating state constitutional provisions protecting the right to keep and bear arms. *See, e.g., People v. Camperlingo,* 69 Cal.App. 466, 231 P. 601, 604 (2 Dist.1924) (statute disallowing convicted felons from possessing firearms upheld as constitutional); *State v. Beorchia,* 530 P.2d 813, 814–15 (Utah 1974) (statute barring aliens, those convicted of a crime of violence, those addicted to a narcotic, and anyone declared mentally incompetent from using or possessing firearms); *see also* Clayton E. Cramer, *For the Defense of Themselves and the State, The Original Intent and Judicial Interpretation of the*

---

41. 6 Dumas Malone, *Jefferson and His Time,* *The Sage of Monticello* 356 (1981).

*Right to Keep and Bear Arms* 24, 26–27 (1994) (hereinafter, "Cramer") (citing Henry VIII's Statute of Winchester (reissued 1511), providing that every man between the ages of sixteen and sixty was required to own and be able to use a bow; the English Bill of Rights (1689), providing that all Protestant subjects "may have arms for their defence[,] suitable to their conditions, and as allowed by law"); II *The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the State of Pennsylvania,* 597–98 (Merrill Jensen ed., 1976) (the Pennsylvania convention to debate the ratification of the United States Constitution, on December 12, 1787, proposed an amendment that "the people have a right to bear arms for the defense of themselves and their own state * * * and no law shall be passed for disarming the people or any of them, *unless for crimes committed * * *"*). (Emphasis added.) But such police-power regulation of the right to keep and bear arms cannot be so restrictive, onerous, or arbitrary as to render the people's constitutionally protected right to do so the exception, rather than the rule, thereby making unduly difficult, if not illusory, the right of qualified, law-abiding members of society to acquire, keep, and bear such arms for any lawful purpose. *See State v. Storms,* 112 R.I. 121, 127, 308 A.2d 463, 466 (1973).

> "[T]he legitimate governmental purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the exercise of this right where the governmental purpose can be more narrowly achieved.
> "* * * *

"[A] governmental purpose to control or prohibit certain activities, which may be constitutionally subject to state regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the realm of protected freedoms, such as the right to keep and bear arms guaranteed in our State Constitution." *State ex rel. City of Princeton v. Buckner,* 180 W.Va. 457, 377 S.E.2d 139, 146, 149 (1988).

Thus, any regulatory regime that imposes such vague and unspecific barriers to arms bearing by law-abiding members of society as requiring a "proper showing of need," § 11–42–18(a), or qualifying as "a suitable person," § 11–47–11(a), must not be administered in such an arbitrary and unreasonable way as to deny people—who are otherwise fit and able to bear arms—their constitutionally protected right to do so for any lawful purpose. But that is exactly what the department has done in this case when it denied plaintiffs a license without a hearing, without defining in advance what constituted "a proper showing of need," and without regard to the lawful purposes they articulated for requesting such a license.[42] Moreover, because the department did so without providing plaintiffs with a hearing and without promulgating any regulations consistent with due process of law, let alone with the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42, I would reverse and order the department to comply with that act and with the dictates of due process.

I also believe that the majority's purported recognition of a constitutionally

---

**42.** The plaintiff Mosby was a gun collector who had been licensed to carry guns by Massachusetts, New Hampshire, Maine, Florida, and the Bureau of Alcohol, Tobacco, and Firearms. He sought a license because he wished to take part in gun-collecting activities in Rhode Island. The plaintiff Golotto owned a business in Smithfield, and, in that regard, he occasionally carried large sums of cash. Consequently, he sought permission to carry a pistol for his own personal security and for self-defense purposes.

protected "individual right flowing to the people to keep and bear arms,"—while at the same time denying a constitutionally protected individual right to bear arms (except "in the military context")—fails to honor the unrestricted plain meaning of our constitution's text or the other legitimate and historical purposes—besides service in the military—that undergird the people's fundamental right to keep and bear arms. Although the majority professes not to define the extent of an individual's right to keep and bear arms, it confers a comparative "favorite son" treatment on the keeping of arms, while strapping its twin arms-bearing brother into a military straitjacket. Thus, the majority says that "[i]t is the keeping of arms that is the *sine qua non* of the individual right under art. 1, sec. 22" and that there exists an "individual right to 'keep' arms in one's home or in his or her place of business." But in contrast to its beneficent treatment of the constitutional right protecting the people's "keeping of arms," the majority concludes—without any textual or historical basis to do so—that the framers of our constitution employed the " 'bear arms' language of article 1, section 22," solely "in the military context," asserting that the constitutional right to bear arms only "was related to bearing for purpose of the militia." Thus, the majority's recognition of an individual right to keep arms "in one's home or in his or her place of business"— but not to carry or to bear such arms for any lawful purpose except "in the military context"—effectively negates all the other legitimate and traditional purposes for

arms bearing, including, without limitation, self defense, personal security, hunting, and serving as a republican check on the power of arbitrary rulers to usurp individual rights.[43] So construed and constricted, the "individual right" of the people to bear arms shrinks and shrivels to a much-diminished and paltry thing—more a one-trick toy pony than a palladium of republican liberty.

When construing constitutional provisions, "our chief purpose is to give effect to the intent of the framers." *In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 7 (R.I.1992). We should do so by adverting to what the people of this state would have understood the words of the constitution ordinarily to mean when they voted to ratify or approve its provisions. Thus, "when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning." *City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I. 1995). Employing this interpretative standard requires that "[e]very clause of the constitution must be given its due force, meaning, and effect, and no word or section can be assumed to have been unnecessarily used or needlessly added." *Id.* In addition, this Court presumes that the framers of the Rhode Island constitution carefully weighed and chose its language to convey a definite meaning. *Id.* "Unless a contrary intent clearly appears on the face of the provision, absent equivocal or ambiguous language, the words cannot be interpreted or extended but must be ap-

---

**43.** In referring to the "individual rights" interpretation of article 1, section 22 of the Rhode Island Constitution, I refer to the people's right, not merely to keep arms in their homes and businesses, but also to bear such arms, such as a pistol or a revolver, for any lawful purpose. I refer to the majority's analysis as a "collective rights" interpretation, because the majority concludes that the right

to bear arms can only be exercised collectively, "in the military context." Because the constitution contains no language supporting such a limited construction, I conclude that the right to bear arms is not so limited, nor is there any evidence that the people of this state ever understood that term to have such a narrow and limited meaning.

plied literally." *Davis v. Hawksley*, 119 R.I. 453, 455, 379 A.2d 922, 923 (1977).

Thus, deciding constitutional cases is not an exercise in mediation or alternative dispute resolution. Attempts to "split the baby in half" when resolving constitutional questions are more apt to result in a doctrinal bloody mess than a correct resolution of the issues to be decided. And constitutional adjudication is not the time nor the place for a "half a loaf is better than none" jurisprudence that tries to give a little something to everyone while striving to capture and hold some chimerical middle ground between two competing interpretations of the constitutional provision in question.

Let us now apply these precepts to the people's right to bear arms in Rhode Island.

## I

### The Phrase "Bear Arms" Refers to Carrying Weapons in Both a Military and a Non–Military Context

The majority concludes that the constitution protects an individual's right to keep arms but not to bear them, except "in the military context." It reaches this result by concluding that "bear arms" is a military term that has meaning only in a military context, whereas "keep arms" protects a right that "flows to the people individually." Although I agree that "the right provided in art. 1, sec. 22 flows to the people individually," I respectfully disagree, however, with the majority's conclusion that the term "bear arms" has meaning only in a military context. Indeed, in a previous case decided during this very term, a unanimous Court referred to persons carrying weapons in a non-military context as "those bearing arms," *see State v. McGuy*, 841 A.2d 1109, 1114 (R.I.2003), just as this Court also did during our last

term when it referred to an individual's carrying a gun for non-military purposes as "arms-bearing activity." *See Volpe v. Gallagher*, 821 A.2d 699, 704 (R.I.2003).

I believe that the framers intended to use the term "bear arms" as the people of this state understood it then, as they understand it now, and as this Court understood it when it decided the recent *McGuy* and *Volpe* cases: "bear arms" refers generally to carrying weapons, but not just in a military context. In doing so, I give the term "bear arms" in the language of art. 1, sec. 22 its plain and ordinary meaning, as well as its full force and effect. *See Sundlun*, 662 A.2d at 45.

Neither current nor historical reference sources define the terms "bear," "arms," or "bear arms" to have only a military meaning. To start with a modern and well-regarded dictionary, Webster's Third New International Dictionary 191 (unabr. 1993), that source defines "bear arms" to mean *both*: "1: to carry or possess arms (the right of the people to keep and *bear arms*—U.S. Constitution) 2: to serve as a soldier." Note that the first meaning given is the more general usage of the term, and that this definition is not limited to serving as a soldier. Also, the leading American dictionary when the people of our state adopted the constitution did not define "bear" or "arms" as having exclusively military meanings. *See* I Noah Webster, An American Dictionary of the English Language (1828) (Webster's). Webster's defined "bear" to mean "to bear, carry, bring, sustain, produce, [or] bring forth." *Id.* Significantly, among a multitude of other meanings—including "[t]o support; to sustain; as to bear a weight or burden" and "[t]o keep afloat,"—Webster's also defined the term "bear" to mean "[t]o wear; to bear as a mark of authority or distinction; as, to bear a sword, a badge, a name; *to bear arms in a coat*." *Id.* (Em-

phasis added.) If the phrase "bear arms" was a military term of art that was ordinarily understood in the early 1840s to refer only to military service, it is clear from Webster's dictionary that its author was unaware of such a limitation. Webster's also defined "arms" as "[w]eapons of offense, or armor for defense and protection of the body." The dictionary went on to provide: "In *law*, arms are any thing which a man takes in his hand in anger, to strike or assault another." *Id.* (referencing Cowel and Blackstone).[44] Thus, neither sources that were extant when the people approved the constitution nor present day references exclusively define the term "bear arms" in connection with military service.

William Blackstone, the famed eighteenth century English jurist, whose treatise on English law often functioned as the legal backbone of American common law during the Revolutionary period and well into the nineteenth century, also defined the "right to bear arms" to encompass an individual right, one that was not limited just to a military context:

> "The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law. * * * [It] is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 William Blackstone, *Commentaries* *139.

Thus, the "right to bear arms," according to Blackstone, constituted an individual "right of having and using arms for self-preservation and defence," one that was

not exclusively associated with soldiering, service in the militia, or with any other military context, but with each individual's "natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* at *139–40. Therefore, "[f]rom the contemporary uses above, and from the dictionary definitions of the period, 'arms' included not only military long guns, but handguns and other self-defense weapons as well." Cramer, at 8.

Also, most compelling of all, many state constitutions during the period from 1776 leading up to the adoption of Rhode Island's constitution in 1842, used the term "bear arms" together with variants of the phrase "in defense of themselves and the state," thereby strongly indicating that the term "bear arms" was not understood at that time to denote only a military or soldierly usage. The constitutions of Alabama (1819), Connecticut (1818), Indiana (1816), Kentucky (1792 and 1799), Michigan (1835), Mississippi (1817), Missouri (1820), Ohio (1802), Pennsylvania (1776 and 1790), Republic of Texas (1838), and Vermont (1777, 1786, and 1793), all used the term "bear arms" with variants of the phrase, "in defence of themselves and the State." *See United States v. Emerson*, 270 F.3d 203, 230 n. 29 (5th Cir.2001) (citing Ala. Const. Art. 1, § 23 (1819); Conn. Const. Art. I, § 17 (1818); Ind. Const. Art. I, § 20 (1816); Ky. Const. Art. 10, ¶ 23 (1792); Mich. Const. Art. I, § 13 (1835); Miss. Const. Art. I, § 23 (1817); Mo. Const. Art. XIII, § 3 (1820); Ohio Const. Art. VIII, § 20 (1802); Pa. Const. Art. I, § 21 (1790)); *see also* Cramer, at 7.

---

**44.** As used in its verb form, Webster's defined "arm" to include "[t]o furnish or equip with weapons of offense, or defense; as, to arm the militia." I Noah Webster, An American Dictionary of the English Language (1828).

Several of these states' courts held that use of the term "bear arms" in their state constitutions was consistent with an individual right to self-defense in a non-military context. The highest state court of Kentucky, as early as 1822, interpreted this qualifying self-defense language to indicate that citizens could exercise the right to bear arms outside of a military context. *See Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 90–92 (1822) (holding that art. 10, sec. 23, of the Kentucky constitution, which provided "that the right of the citizens to bear arms in defence of themselves and the state, shall not be questioned," protected the right of individual citizens to carry concealed arms outside of a military context). Although "immediately after the decision, the people of that state amended the state constitution to permit the legislation," *State v. Hirsch*, 177 Or.App. 441, 34 P.3d 1209, 1212 (2001), the point is not that state constitutional provisions providing for a right to bear arms *ipso facto* preclude legislation regulating the carrying of concealable weapons—they do not—but that the use of the words "bear arms" in state constitutions did not then, nor does it now, have reference solely to military service.

Thus, in 1840, the Supreme Court of Alabama also interpreted the "bear arms" language of its state constitutional provision to mean that a citizen has the right to carry a weapon, openly, "for the purpose of defending his person." *State v. Reid*, 1 Ala. 612, 621 (1840). Responding to the defendant's contention that he had the

right to carry a weapon concealed for the purpose of self-defense—a right protected by art. 1, sec. 23, of the Alabama constitution[45]—the Reid court answered that there was no evidence "that the defendant could not have defended himself as successfully, by carrying the pistol openly * * * consistently with the law which recognizes the right of self protection." *Reid*, 1 Ala. at 621. Thus, if the term "bear arms" could be used only in a military context when the people adopted our constitution in 1842, as the majority concludes, then how could these other extant state constitutions use it when referring to a personal right of self-defense?

As noted above, reference sources, state and federal constitutional language, and judicial interpretations of that language—all of which were extant when Rhode Island held its constitutional conventions in 1842—show that when Rhode Island framed and adopted its constitution, the words "bear arms" were not limited in meaning just to militia service, but also applied to carrying arms for self-defense and for other non-military purposes.

## A. The Majority's Reliance on the Tennessee Supreme Court Decision in *Aymette v. State* Is Misplaced

In deciding that "bear arms" has only a military meaning, the majority opinion relies on an 1840 decision by the Tennessee Supreme Court, in *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840).[46] The *Aymette*

45. Article 1, section 23, of the Alabama constitution provided at that time: "Every citizen has a right to bear arms, in defence of himself and the State." *State v. Reid*, 1 Ala. 612, 614–15 (1840).

46. Given the distance between the states and the short period between the Tennessee court's issuance of *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) in 1840 and the framing of the constitution in Rhode Island in the

early 1840s, it is unlikely that the framers of the constitution were aware of this 1840 Tennessee decision. Moreover, they most likely would not have been in any way influenced by a decision issued in a remote southern slave state by a court interpreting a racist right-to-arms provision—"the free white men of this State, have a right to keep and bear arms for their common defence"-framed in the aftermath of the Nat Turner slave rebellion of

case, however, does not justify the majority's constriction of the words "bear arms," as that phrase is used in our constitution, to just a military context.

In *Aymette*, 21 Tenn. at 155, the antebellum Tennessee Supreme Court addressed the constitutionality of a statute prohibiting the wearing of "any bowie knife, or Arkansas tooth-pick, or other knife or weapon, that shall in form, shape or size resemble a bowie knife or Arkansas tooth-pick, under his clothes, or * * * concealed about his person." The court held that this statute did not violate Tennessee's constitution, guaranteeing that "the free white men of this State, have a right to keep and bear arms for their common defence." *Aymette*, 21 Tenn. at 156, 161–62.

When read in its entirety, however, *Aymette* does not stand for the proposition that the term "bear arms" can be used only in a military context. Rather, as used in the context of the Tennessee constitution, that term referred to service in a militia because the Tennessee constitution expressly provided that "the free white men of this State, have a right to keep and bear arms *for their common defence.*" *Id.* at 156. (Emphasis added.)

The court pointed to the "for their common defence" language that immediately followed the words "bear arms" in the Tennessee Constitution, observing that "[i]f the history of the subject had left in doubt the object for which the right is secured, the *words* that are employed [in art. 1, § 26] must completely remove that

doubt. It is declared that they may keep and *bear* arms for their *common defence.*" *Aymette*, 21 Tenn. at 158. The court emphasized that "the right to *bear arms* is not of [an] unqualified character. The citizens may bear them for the *common defence.*" *Id.* at 160. For this reason, the court explained that the words "bear arms" in art. 1, § 26 "have reference to their military use." *Aymette*, 21 Tenn. at 158.

Significantly, our constitution never has included such limiting "common defense" language. Moreover, if the meaning of "bear arms" by itself meant that the free white men of Tennessee could bear arms only for a military-related purpose, then there would have been no need for the framers of the Tennessee constitution to qualify it by also including the phrase "for their common defence" in this clause of the constitution, because such language would have been redundant of what it meant for the people to "bear arms." *See* Cramer, at 7. Thus, even the Aymette court did not suggest that the words "bear arms" could not have a non-military meaning when used in another context, such as in the Rhode Island Constitution, that does not include any limiting "for the common defense" language after its "bear arms" clause.

Lastly, as evidence that the term "bear arms" in the Tennessee constitution had a military meaning, the Tennessee court pointed to section 28 of the Tennessee constitution's bill of rights, which used the phrase "*bear arms*" when allowing a con-

---

1831. *Aymette*, 21 Tenn. at 156. This is especially so when one recalls that Rhode Island had abolished slavery many years before adopting its first constitution. Also, if the framers had wished to follow the 1840 *Aymette* decision when they drafted the language of art. 1, sec. 22, why would they not have included the "for the common defence" language found in the Tennessee constitution

when its supreme court decided the *Aymette* case—especially when the *Aymette* court ruled that such language limited the "bear arms" reference in the Tennessee constitution to this one expressed purpose? The framers of our constitution, however, failed to do so, suggesting they had no such intention to restrict arms bearing to a military purpose.

scientious objector to pay a fee rather than serve in the militia. *Aymette*, 21 Tenn. at 161. Importantly, no such conscientious-objector provision exists in our constitution.

The court went on to reason that an individual citizen, concealing a weapon under his or her clothing, did not "bear arms," and that a man, hunting with a rifle has not "*borne arms.*" *Id.* Thus, the *Aymette* court did not look only to the text of the Tennessee Constitution to conclude that "bear arms" related only to military service. Nevertheless, considering the entirety of the court's analysis, the court found several textual reasons why the term "bear arms," as used in the Tennessee constitution, had only a military meaning. Those textual reasons do not exist in our constitution. In any event, *Aymette* does not hold that the term "bear arms," under any circumstances, can be used only to refer to military service.[47]

## B. The Ninth Circuit Decision in *Silveira v. Lockyer* Is of Limited Precedential Value Because the Preamble to the Second Amendment Strongly Influenced the Court's Conclusion in that Case

The majority also cites *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.2002), for the proposition that the term "bear arms" can be used only to refer to military service. The opinion in *Silveira*, 312 F.3d at 1067–

75, however, is of limited value to the analysis of our constitution because that court based its conclusion largely on the preamble to the Second Amendment, which explicitly references the militia—a preamble that is conspicuously absent from the language in art. 1, sec. 22. The Ninth Circuit in *Silveira* employed a three-part analysis to conclude that the Second Amendment protected only the right to bear arms as a member of a militia. *Silveira*, 312 F.3d at 1068–75. It said that the federal constitution's preamble affected the meaning of the entire text of the amendment because "[i]f the term [militia] refers * * * to * * * the state-created and -organized military force, it [is] * * * necessary to attribute a * * * different meaning * * * to the amendment as a whole." *Id.* at 1069. The court then reasoned that the term "bear arms" is customarily used to refer to the carrying of arms for military service, and not the private carrying of arms for personal reasons. *Id.* at 1072. The court, however, admitted that the first clause—explicitly referencing the militia—limited the purpose of the right to "bear arms" and "it also helps shape and define the meaning of the substantive provision contained in the second clause." *Id.* at 1075. Thus, the court based its conclusion that the term "bear arms" is a military term of art largely on the fact that the first portion of the Second Amendment specifically refers to the militia. *Id.*

---

**47.** In addition, the *Aymette* court said that a statutory prohibition against bearing weapons openly—not concealed—if the weapons were of the type that might be proper for military use, would implicate the constitutionally protected right to bear arms in defense of the state. *Aymette*, 21 Tenn. at 160–61. Here, despite the complete lack of any qualifying language in the text of art. 1, sec. 22, and even if the right to bear arms guaranteed by the Rhode Island constitution were only for the purpose of the common defense, then G.L.1956 § 11–47–18(a) forbids unlicensed

carrying of a pistol or revolver "whether concealed or not." A pistol is appropriate for military use, as evidenced by the text of the Militia Law of 1843. *See* Militia Law, 1843 R.I. Acts and Resolves, § 29. Because § 11–47–18 requires a license to carry a pistol or revolver openly, as well as concealed, it implicates not only the individual right to bear arms that I believe is guaranteed under art. 1, sec. 22, but also the constitutional right to bear arms for the common defense that the majority concedes exists under the constitution. *See Aymette*, 21 Tenn. at 161.

The lack of support for the majority's conclusion that the right-to-bear-arms clause in the constitution has only a military meaning is underscored by the principal cases it relies upon to buttress such a holding. The *Aymette* decision emanates from an antebellum slave-state court interpreting a racist arms-bearing clause that contained an express "for the common defence" limitation on its right-to-bear-arms language. The *Silveira* decision comes from the oft-reversed Ninth Circuit when it was interpreting the Second Amendment of the United States Constitution with its militia preamble. Also, in *Silveira v. Lockyer*, 328 F.3d 567 (9th Cir.2003) (denying rehearing *en banc*) (Kozinski, J., dissenting), as Judge Kozinski observed in his dissent to the court's refusal to rehear the case *en banc*:

> "The majority falls prey to the delusion—popular in some circles—that ordinary people are too careless and stupid to own guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll. But the simple truth—born of experience—is that tyranny thrives best where government need not fear the wrath of an armed people. Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process." *Id.* at 569.

Although the Ninth Circuit determined that "bear arms" is a military term of art, the Fifth Circuit came to the contrary conclusion in *Emerson*. The court in Emerson, 270 F.3d at 231, concluded that the term "bear arms" refers generally to the carrying or wearing of weapons. The court said, although "[i]t is certainly proper to use the phrase in reference to the carrying or wearing of arms by a soldier * * *, [the] argument that 'bear arms' [is] exclusively, or even usually, used to *only* refer to the carrying or wearing of arms by a soldier * * * must be rejected." *Id.*

I agree with the *Emerson* court's conclusion and would hold that the term "bear arms" in our constitution does not refer strictly to a military usage. Indeed, this conclusion seems inescapable given all the references to self-defense purposes for arms bearing in other state constitutions that were extant when the framers placed this clause in our constitution.

Likewise, our own recent opinions in *McGuy* and *Volpe* show that, consistent with contemporary understanding and dictionary definitions, "arms bearing" is not understood even by the current members of this Court to be limited in its usage to just a military context. Thus, earlier this term, a unanimous Court in *McGuy*, 841 A.2d at 1114, discounted the defendant's purported fear of his "gun-toting" victim as a justification for committing murder, saying: "People who fear *those bearing arms* are not adequately provoked to shoot and kill them merely because the latter become verbally abusive and draw too close for comfort." (Emphasis added.) It is important to note that the arms-bearing victim in *McGuy* was neither a member of the military, nor had he armed himself in defense of the state.

And last term, in *Volpe*, 821 A.2d at 702–04, we addressed the question of whether a property owner could be liable for allowing her mentally ill son to store and use weapons and ammunition on her property. In describing the trial justice's finding, this Court said that "defendant breached no duty that she owed to her next-door neighbors when she failed to disarm her son or otherwise control his *arms-bearing* activity." *Id.* at 704. (Emphasis added.) As in *McGuy*, there was no suggestion in *Volpe* that defendant's son affiliated himself with

any military organization or that he used, carried, or stored the guns at his mother's house for any militia or common-defense purpose. Although neither *McGuy* nor *Volpe* addressed the meaning of the words "bear arms" as they are used in art. 1, sec. 22, of the constitution, these recent examples of this Court's own use of the terms "arms-bearing" and "bearing arms" while referring to the respective factual situations in those cases, shows that, in normal parlance, the words still refer, as they did in 1842, to individual gun carrying, storage, and use without limitation to service in the militia. If, as the majority concludes, the term "bear arms" refers exclusively to carrying weapons in connection with military service, then the members of the Court who joined in one or both of these opinions and who approved them as drafted would not have done so without correcting or objecting to such inaccurate language.[48]

### C. The Supreme Court of Maine Recently Has Held That the Term "Bear Arms" Refers to an Individual, Rather Than to a Collective Right to Bear Arms

Another relatively recent example of a court's construing "bear arms" to have an individual-rights meaning comes from Maine. The Maine Supreme Judicial Court interpreted an arms-bearing provision of the Maine state constitution—one that is similarly worded to art. 1, sec. 22—to recognize an individual right to carry weapons for non-military purposes. *See State v. Brown*, 571 A.2d 816 (Me.1990). In *Brown*, 571 A.2d at 816, the court held that art. I, sec. 16, of the Maine Constitution, as amended in 1987, created "for every citizen the individual right to bear arms, as opposed to the collective right to bear arms for the common defense." Article I, section 16 provided that " '[e]very citizen has a right to keep and bear arms; and this right shall never be questioned.' " *Brown*, 571 A.2d at 816. A 1987 amendment deleted a reference to "the common defense" from the text of the section. *Id.* Before the 1987 amendment, the Maine Supreme Judicial Court had interpreted this section as guaranteeing to the citizens of Maine only a collective right to bear arms for the common defense of the state. *See State v. Friel*, 508 A.2d 123, 125 (Me. 1986). In *Brown*, 571 A.2d at 818, however, the court held that the amended clause protected an individual right, albeit one that was still subject to reasonable regulation by the legislature.

---

**48.** The fact that the justices of this Court who join the majority's opinion in this case approved the arms-bearing language used in either one or both of this Court's recent decisions in *State v. McGuy*, 841 A.2d 1109, 1114 (R.I.2003) and *Volpe v. Gallagher*, 821 A.2d 699, 704 (R.I.2003), and that they did so only *after* this case was first argued to them, lends even more support to the conclusion that the members of the Court who joined in one or both of these opinions, and who approved them as drafted, would not have done so without correcting or objecting to the arms-bearing language used in these opinions if such words were appropriate only "in the military context." Presumably, those members of the Court who joined in the *McGuy* and *Volpe* opinions—and who now join the majority's opinion in this case—not only knew

that this case was pending, but also that the department and other amici were suggesting in their arguments that the expression "to bear arms" was limited just to "the military context." But the arms-bearing language that the justices of this Court approved in *McGuy* and *Volpe* conclusively refutes that notion. Therefore, simply asserting that the arms-bearing language used in these recent cases is "of no moment to this appeal" does not make it so. The only way to reconcile these disparate positions is to say that the meaning of "bear arms" in our constitution is different from when we used that same terminology in deciding these other cases. But, to adopt an expression that the Tennesseans on the *Aymette* court might have used, and for the very reasons enumerated in this dissenting opinion, "that dog just won't hunt."

*Brown* provides further support for the conclusion that the term "bear arms" is not solely a military term of art. Like Rhode Island's art. 1, sec. 22, the language in Maine's constitution concerning the right to bear arms is unqualified by any sort of Second Amendment-type preamble limiting the scope of the right, or linking the right to the maintenance of a "well-regulated militia." *See* U.S. Const. Amend. II. Nor is there a "common defence" restriction to the right, as was true for the Tennessee constitution in *Aymette*, 21 Tenn. at 156.

Including Maine (since 1987), six other state constitutions, like Rhode Island, guarantee the people's right to keep and bear arms without reference to a specific or limited purpose for doing so.

"Their guarantees are generally worded as the right 'to keep and bear arms shall not be infringed' or 'abridged.' *As this guarantee is without assignment of a purpose, it must be assumed the Framers intended at a minimum to protect the basic historical reasons for a right to arms: (a) the right of personal defense; (b) preference for a militia over a standing army; and (c) the deterrence of governmental oppression.* One court simply capsulized the reasons for having arms as follows: 'The Constitutions of the United States and Louisiana give us the right to keep and bear arms. It follows, logically, that to keep and bear arms gives us the right to use the arms for the intended purpose for which they were manufactured.' It can also be inferred that the Framers were aware of the guiding principles of interpretation *'Inclusio Unis Est Exclusio Alterius'* (the inclusion of one is the exclusion of another) and feared that *by including or assigning only one of the historical reasons, e.g., militia, the courts would, given their penchant for a restrictive interpretation of the right,*

*limit the guaranteed right only to the purpose stated."* Dowlut & Knoop, 7 Okla. City U.L. Rev. at 224–25 (quoting *McKellar v. Mason*, 159 So.2d 700, 702 (La.Ct.App.), *aff'd*, 245 La. 1075, 162 So.2d 571 (1964)). (Emphases added.)

In sum, without surveying each and every court decision from every state, "it is significant that the [court] decisions which recognize that the phrase 'to bear arms' was not exclusively military far exceed those which draw this distinction." Cramer, at 7–8.

## II

### The Failure of the Framers to Include Qualifying Language in Article 1, Section 22, of the Constitution Shows Their Intent to Guarantee the People of This State Their Individual Right to Keep and Bear Arms for Any Lawful Purpose

Although the framers of our constitution certainly were aware of the wording of the Second Amendment to United States Constitution when they drafted the language of art. 1, sec. 22, and omitted the Second Amendment's prefatory militia clause from our constitution, the historical evidence suggests that they also were aware of the various constitutions of the other states, some of which included limiting language in their analogous arms-bearing clauses. Nevertheless, the framers of our constitution chose to omit such potentially limiting language from the unqualified phrasing set forth in art. 1, sec. 22. Thus, they failed to include any reference to a limited purpose for which the right of the people to bear arms could be exercised. It is appropriate to consider the omission of any qualifying language from such an enactment, when the framers clearly had the opportunity to adopt the potentially limiting phraseology used in analogous provisions of other ex-

tant constitutions, yet they failed to do so. For example, in *State v. Feng*, 421 A.2d 1258, 1264 (R.I.1980), this Court held "[w]e shall not interpret a statute to include a matter omitted unless the clear purpose of the legislation would fail without the implication."

Here, by a parity of reasoning, certain state and federal constitutional provisions containing arms-bearing language were extant when Rhode Island adopted its original constitution in 1842. Unlike the constitution adopted in this state, several of these other constitutions linked their arms-bearing language with some specified but limited purposes, such as the common defense or militia service.[49] Thus, to take the most well-known example of such a provision, the Second Amendment to the United States Constitution said then (as it does now): "*A well-regulated militia, being necessary to the security of a free state*, the right of the people to keep and bear arms, shall not be infringed." (Emphasis added.) Unlike this provision in the federal constitution and unlike the analogous provisions in several other state constitutions of that period, our constitution does not cobble its right-to-bear-arms pro-

vision to common-defense language or to clauses describing the necessity of a "well-regulated militia" to the "security of a free state."

The historical record of the Rhode Island constitutional conventions that led to the adoption of the constitution shows that the delegates examined the laws and constitutions of neighboring states when drafting Rhode Island's original constitutional language. With respect to its suffrage provisions, for example, Mr. Ennis, a delegate from Newport, commented during the convention debates that "[t]his State ought to be as liberal as neighboring States." *See* Debates and Proceedings in the State Convention, Held at Newport, September 13–22, 1842, at 53, *in Rhode Island Constitution*, Vol. 7 (collected documents bound by E.R. Potter, available in the State Law Library). Again, in debating the language of article 1, Mr. Ennis said in defense of his proposition "these doctrines were not new or singular * * * [t]hey were incorporated in other constitutions, and had been asserted by writers upon constitutional law." Debates and Proceedings at 29. When debating the

---

49. As previously noted, in 1789, the framers of the United States Constitution included a clause in the Second Amendment, referring to a "militia." Eleven of the states ratified it—including Rhode Island—and it went into effect on December 15, 1791. General Laws of Rhode Island, *Constitution of the United States*, Articles of Amendment, Article 1 at 53 (compiler's note) (Matthew Bender & Co. 2001). The constitution of Massachusetts, first enacted in 1780, provided that the people had the right to "keep and to bear arms for the common defence." Mass. Const. pt. 1, art. 17, *reprinted in 3 The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* 1892 (Francis Newton Thorpe ed. 1909). From 1819 until its amendment in 1987, the constitution of Maine said, in pertinent part: "Every citizen has a

right to keep and bear arms for the common defense * * *." *State v. Brown*, 571 A.2d 816, 816 n. 1 (Me.1990) (quoting Me. Const. art. 1, sec. 16 (amended 1987)). Likewise, Connecticut's constitution, enacted in 1818, contained the provision: "Every citizen has a right to bear arms in defense of himself and the State." Conn. Const. art. 1, sec. 17 (1818), *reprinted in 1 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United ed States of America* 538 (Francis Newton Thorpe ed. 1909). The Rhode Island Constitution, however, never has contained any of these potential limitations, qualifications, and restrictions on arms bearing by the people, suggesting that the framers and the people of this state did not agree that the right should be subject to such limitations, qualifications, or restrictions.

formation of the Legislature, Mr. Simmons of Johnston proposed a division of power "resembl[ing] that in the Constitution of the United States * * *." Debates and Proceedings at 31. The record of these debates provides tangible evidence that the drafters considered both the constitutions of other states and the Constitution of the United States when they chose the language to use in the Rhode Island Constitution.

Because these preexisting constitutional sources were available for the framers to draw upon, and because the record of the Rhode Island constitutional debate indicates that the texts of other state constitutions and of the federal constitution were familiar to and were consulted by the framers, it is significant that they failed to include any reference to the militia, or to any other potential "common defense" limitation on the purpose for which the "people" could "bear arms" in the language they chose for art. 1, sec. 22. As this Court observed in *Feng*, the failure of the framers to include such purposive language indicates a rejection of such limitations, rather than an implicit acceptance. *See Feng*, 421 A.2d at 1264.

In sum, the constitution's unqualified arms-bearing language is evidence of the framers' intent to safeguard a *broader* right to the people of Rhode Island to bear arms than that provided for in other extant constitutions at that time that limited the right for the "common defense," for self-defense, or for militia-related purposes. In any event, the use in 1842 of arms-bearing language in other extant state constitutions when referring to the people's right of self-defense conclusively refutes any notion that the term "bear arms" could be used only in a military context when Rhode Island adopted its constitution in 1842. Significantly, despite a flood of court decisions on this subject, a torrent of law review articles and books about the right to bear arms, and innumerable amendments and readoptions of our own and other state constitutions since 1842, the framers and the people of this state never have seen fit to qualify, limit, or restrict the original "right to keep and bear arms" language in the constitution to a military or common-defense purpose. Lacking any language potentially limiting or qualifying the right to bear arms, art. 1, sec. 22 of the constitution—the only provision in our constitution discussing the right of the people to keep and bear arms—should not acquire such restrictive barnacles by judicial interpretation, especially when the framers, who were aware of these other constitutions, chose to omit their qualifying language from the constitution that they drafted for Rhode Island. Accordingly, this Court should not so limit and restrict what the constitution does not so limit or restrict.

### III

### The Declaration of Rights of 1790 Shows That Article 1, Section 22 Protects an Individual Right to Bear Arms Outside a Military Context

The majority also finds support for a collective-rights reading of the constitution's arms-bearing language in the so-called Declaration of Rights of 1790 (Declaration). Because the drafters of the Declaration used the phrase "bearing arms" in a proposed amendment to the United States Constitution that would protect conscientious objectors, the majority suggests that the "bear arms" language that the framers included more than fifty years later in the 1842 constitution can be used to refer to such activity only in a military context. I conclude, however, that the drafters of the Declaration used the phrase "bear arms" to refer to both the military and non-military carrying of weapons and that, in any event, given its remoteness in time and purpose from the

constitution's adoption, the declaration is a weak reed on which to put much interpretive weight.

The Declaration of Rights of 1790 was the first document expressly referring to the people's right to bear arms in Rhode Island. As such, "[t]he evidence strongly suggests that Rhode Island's request was for an *individual* right to keep and bear arms. Whether this right was for the purpose of checking domestic tyranny, or defense against private criminals, or both, is impossible to definitely determine from the available evidence." Cramer, at 50. Although the constitutional convention assembled at Newport ratified the Declaration of Rights of 1790 for its requested insertion into the United States Constitution, the General Assembly never enacted the full text of the document, and it was never adopted as a part of the federal constitution.[50] *See* Kevin D. Leitao, *Rhode Island's Forgotten Bill of Rights*, 1 Roger Williams U.L. Rev. 31, 32–34 (1996).

The Declaration included the following provision about the right to bear arms: "That the people have a right to keep and bear arms; that a well-regulated militia, including the body of the people capable of bearing arms, is the proper, natural and safe-defence of a free State." Rhode Island's Bill of Rights, in *Theodore Foster's Minutes of the Rhode Island Convention of March 1790*, 93, 95 (1929); see *also* Leitao, 1 Roger Williams U.L. Rev. at 47; Patrick T. Conley, *First in War, Last in Peace, Rhode Island and the Constitution, 1786-1790*, 26 (1987). It is clear from the Declaration's separation of the clause saying that "the people have a right to keep and bear arms" from the clause pertaining to the militia that the drafters of the Declaration envisioned both a general right for

the people to bear arms and a right of those people who were capable of "bearing arms" to participate in the militia, for the defense of the state. The fact that the term "bearing arms" also appears in the proposed conscientious-objector provision does nothing to negate the dual concept clearly articulated in the above-mentioned text. Nor was it improper for the drafters of the Declaration to use the term "bear arms" in a military context. Indeed, the use of the term "bear arms" in these two provisions of the Declaration illustrates that the military context was not the only acceptable or logical context in which the phrase could be used.

Although the court in *Aymette*, 21 Tenn. at 161, used the conscientious-objector provision in that state's constitution to impute a similar meaning to the same phrase used in the provision guaranteeing the right to bear arms, there is no such comparable use of the phrase "bear arms" elsewhere in the Rhode Island constitution. Therefore, the language used in the Declaration of Rights of 1790, in the form of a proposed amendment to the federal constitution, which was never enacted by the General Assembly or incorporated in any later constitution, is hardly an authoritative source of a militia-only interpretation of the "bear arms" language of art. 1, sec. 22, which the people of this state adopted more than fifty years later.

## IV

## The Militia Laws of 1798 and 1843 Provide No Evidence That Undermines an Individual Rights Reading of Article 1, Section 22, of the Rhode Island Constitution

The majority also cites "[a]n Act to organize the Militia of this State," P.L. 1798

---

**50.** Although the General Assembly did enact a statutory bill of rights in 1798, entitled "An Act declaratory of certain Rights of the People of this State," this enactment did not include a provision about the right to bear arms. *See* Kevin D. Leitao, *Rhode Island's Forgotten Bill of Rights*, 1 Roger Williams U.L. Rev. 31, 54 n. 58 (1996).

(Militia Act of 1798) and the Militia Law of 1843, 1843 R.I. Acts and Resolves (Militia Law of 1843), as authorities for the proposition that art. 1, sec. 22, confers a right to keep arms only for using such weapons for the common defense.[51] Nevertheless, I fail to see how the regulation of gun use in the military and in the supply of the state's militia in any way restricts the people's right to bear arms in the constitution to only a military context. Nor are these laws in any way inconsistent with an individual-rights reading of the arms-bearing language of art. 1, sec. 22.

Indeed, the text of the earlier 1798 law anticipates that members of the militia would provide their own weapons for use in their military capacity. Militia Act of 1798, § 1. The Militia Law of 1843 effectively ended this practice by authorizing the state to furnish the necessary equipment to those participating in the militia. *See* Militia Law of 1843, § 36. The 1843 statute authorized the purchase of specific arms and regulated the storage of such state-purchased firearms in the city and town arsenals. *Id.* The statute provided, in pertinent part:

"Each chartered regimental company of light infantry, grenadiers, and riflemen, raised at large, shall be furnished with muskets or rifles, and every such company of cavalry, with sabers, belts, and pistols, and every such company of artillery with muskets, if applied for, and with swords and belts, on application to the Quarter-master General, and on delivering to him a sufficient bond * * * for the safe keeping and return of the same when required * * * and producing to him satisfactory evidence that a suitable armory or place of deposite

[sic] for such muskets or rifles has been provided in the town or city within which said company is situated; which arms so furnished shall be carefully kept for the use of such company for military purposes only." Militia Law of 1843, § 29.

It is unlikely that, as the majority suggests, the drafters of the constitution guaranteed a right of the people to keep and bear arms only for the purpose of military use, and then, a mere one year later, the General Assembly rendered this purpose largely vestigial by enacting a law requiring the state to supply militia companies with weapons—upon application, bonding, and the company providing evidence of means for their proper storage in designated arsenals.

Most importantly, the existence of these statutory provisions and others dedicated to the explicit regulation of militia practices—and limitations on the use of specific firearms in a militia context—does not negate the framers' decision to protect an individual right of the people in this state to keep and bear arms, whatever the people's collective responsibility and duties may be to keep and bear specific arms while serving in a well-regulated militia. Thus, neither the Militia Act of 1798 nor the Militia Law of 1843 provide evidence that art. 1, sec. 22 only protected the right of the people to bear arms for service in the militia. Even if the enactment of the Militia Law of 1843—requiring that certain weapons "shall be furnished" to those serving in the militia—did not exclude the possibility that individual militia members could still provide such weapons for themselves,[52] one cannot infer from such laws

---

**51.** It is important to note that both the Militia Act of 1798, P.L. 1798 § 4 and the Militia Law of 1843, 1843 R.I. Acts and Resolves,

§ 29, include "pistols" as weapons that are appropriate for use in the militia.

**52.** *But see* An Act to Regulate the Militia, P.L. 1844, § 65:

as these—regulating who would supply what weapons for use in the militia—that the people no longer were entitled under the constitution to keep and bear arms for non-military purposes. Laws regulating arms for use in the militia are just that— they simply do not speak to the people's constitutional right to keep and bear arms for other purposes, much less do they signal any trend moving away from arms bearing for non-military purposes.

V

**The Common–Law Tradition of Self–Defense in Rhode Island Indicates That the People of This State Have Long Recognized an Individual Right to Bear Arms in a Non–Military Context**

Although the people adopted the constitution in 1842, a more recent legislative perspective on the right to bear arms also supports an individual-rights reading of art. 1, sec. 22. *See* The 1959 Senate Report of the Committee to Review the Firearms Statutes, *State of Rhode Island and Providence Plantations, Journal of the Senate*, vol. 68, no. 17, Appendix (Feb. 3, 1959). Pursuant to the provisions of Resolution 67 of the January 1958 Session of the General Assembly, the committee to review the firearms statutes submitted recommendations to strengthen and improve the firearms laws of this state. *Id.* In its report, the committee unequivocally stated that "[i]t recognized the *constitutional and fundamental right* of the law abiding citizen to possess and bear arms." *Id.* (Emphasis added.) Referring to the

purpose for which the citizens could exercise this right, the committee said it was "opposed to legislation which can make prudent, law abiding citizens unwitting violators, or which denies *the right of self defense.*" *Id.* (Emphasis added.) Lastly, the committee clearly said that "legislation regulating concealable firearms should not be unreasonably restrictive." *Id.*

This twentieth-century state legislative committee's view of the right of Rhode Island citizens to carry and own firearms provides a contemporary confirmation that the right of the people of this state to keep and carry weapons for self-defense purposes was considered to be fundamental, to be guaranteed by the "bear arms" language of the constitution, and that the General Assembly did not intend to unreasonably burden law-abiding citizens of this state when updating the firearms laws, including §§ 11–47–8 and 11–47–18.

In addition, this Court in *State v. Storms*, 112 R.I. 121, 125, 308 A.2d 463, 465 (1973), espoused essentially the same view. The Court there noted that § 11–47–18 did not restrict "the right of persons generally to purchase, own, *carry, transport or have in their possession or control* most kinds of firearms." *Storms*, 112 R.I. at 125, 308 A.2d at 465. (Emphasis added.) The *Storms* Court addressed the Legislature's intent in enacting § 11–47–18, saying, "the goal of the Legislature was to prevent criminals and certain other persons from acquiring firearms generally and handguns in particular *without at the same time making unduly difficult such*

"Any non-commissioned officer or private of a regimental company or of a volunteer corps attached thereto, who shall while under arms or on duty * * * appear * * * with other arms and accoutrements than what the law requires * * * shall be put under guard by the officer commanding the field * * * for a time not exceeding the time

the troops shall be under arms, and shall in addition thereto be liable to a fine of twenty dollars; to be recovered by complaint and warrant before any justice of the peace * * * or be imprisoned, at the discretion of the court trying such offender, not exceeding ten days."

*acquisition for other members of society."* *Storms,* 112 R.I. at 127, 308 A.2d at 466. (Emphasis added.) This Court, in *Storms,* not only interpreted art. 1, sec. 22 to confer an individual right to own and carry firearms, but it also properly indicated that the Legislature's intent in updating the laws regulating firearms was not to unduly burden a law-abiding member of society's acquisition of such firearms for proper purposes, such as self-defense and personal security. *See Storms,* 112 R.I. at 127, 308 A.2d at 466.

Lastly, Rhode Island has long-recognized that people have the right to use deadly force in their own self-defense, provided they cannot otherwise protect themselves. *See, e.g., State v. Ventre,* 811 A.2d 1178, 1183 (R.I.2002); *State v. Ballou,* 20 R.I. 607, 610–11, 40 A. 861, 863 (1898); *State v. Sherman,* 16 R.I. 631, 633, 18 A. 1040, 1041 (1889). The language of art. 1, sec. 22, when read in conjunction with this common-law tradition, lends strong support to an individual-rights reading of the right to bear arms. As early as 1884, this Court recognized the right of self-defense as a "rule of law * * * that when one is attacked by another * * * he may kill his assailant, provided he cannot otherwise protect himself." *Ballou,* 20 R.I. at 610–11, 40 A. at 863 (citing Trial of Congden, which occurred in East Greenwich in 1884). Likewise, in *Sherman,* 16 R.I. at 633, 18 A. at 1041, this Court said that "if [an] attack [is] made with deadly weapons, or with murderous * * * intent, the assailed may stand his ground, and if need be kill his assailant."[53] It would be extremely difficult for such an "assailed" person, who is under an attack made with deadly weapons, to stand his or her ground "and, if need be kill his [or her] assailant" if the assailed person could not bear arms to do so.[54]

It is true that the law of self-defense in this state is tempered by the duty to attempt a retreat in some circumstances, if the person attacked is consciously aware of an open, safe, or available avenue of escape. *See, e.g., State v. Ordway,* 619 A.2d 819, 823–24 (R.I.1992). Nevertheless, subject to that qualification, deadly weapons, such as pistols and revolvers, still may be used lawfully to repel any kind of personal attack that is potentially deadly in nature. *See Ventre,* 811 A.2d at 1183–84. Thus, in *Ventre,* this Court recently vacated a second-degree murder conviction in a case in which the defendant shot two other men with his revolver, asserting that he was exercising his right of self-defense when doing so. *Id.* at 1183–85. In reversing his conviction, we held that the trial justice had instructed the jury erroneously on the issue of self-defense. *Id.* at 1184. The defendant, charged with second-degree murder and assault with a dangerous

---

**53.** It is helpful to consider self-defense cases that this Court decided in the nineteenth century because they provide insight into the intent of the nineteenth-century framers who drafted the language of art. 1, sec. 22 and of the nineteenth-century people of this state who enshrined it as a fundamental right in their constitution when they approved it in 1842.

**54.** More recently, this Court has adverted to the "right" of self-defense in *State v. Hurteau,* 810 A.2d 222, 225 (R.I.2002) (per curiam) ("Whether a defendant has the *right* of self-defense against the police naturally depends on whether there was excessive force in effectuating the arrest."), in *In re Paul F.,* 543 A.2d 255, 257 (R.I.1988) (G.L.1956 § 11–8–8 creates a presumption that a victim defending his or her home is implementing the *"right* of self-defense"), and in *State v. Quarles,* 504 A.2d 473, 476 (R.I.1986) (the Court agreed that the "castle doctrine" afforded "due recognition to the value of human life while recognizing that the *right* of self-defense is born of necessity and should terminate when the necessity is no more"). (Emphases added.)

weapon, insisted that he had acted in self-defense when he used a revolver in the parking lot of a social club to shoot and *kill* one of his alleged assailants and to shoot and wound another. *Id.* at 1180–81. According to the defendant, because the men he shot were beating him with their fists and feet, he was entitled to use his revolver to shoot them in self-defense. *See id.* at 1183. We emphasized that the right to self-defense does not exist solely in one's home and does not depend on the kind of "force" the offensive party employed. *Id.* Rather, we noted that "the permissible degree of force used in self-defense depends on that which is necessary under all the circumstances to prevent any injury to the person seeking to defend himself," and that "the necessary force must be determined in light of all the surrounding circumstances." *Id.* Therefore, we ruled that the trial justice's jury instruction—advising the jury that the defendant " 'may not use any force that exceeds the force that he perceives to be upon him' "—was misleading because it was not the *type* of force that the attacking party was using on the alleged victim—in that case, fists and feet—that was relevant to a self-defense claim, but rather the *degree* of force used. *Id.* As a result, we reversed defendant's conviction, vacated the guilty verdict, and sent the case back for a new trial. *Id.* at 1185.

Thus, Rhode Island's long-standing recognition of each individual's right to defend himself or herself from a murderous attack with that "degree of force * * * which is necessary under all the circumstances to prevent any injury to the person seeking to defend himself," *Ventre,* 811 A.2d at 1183, lends support to the proposition that the people may, under certain circumstances, as in *Ventre,* bear and use pistols and revolvers to defend themselves in the exercise of their "constitutional right to keep and bear arms." As *Ventre* con-

firmed, in Rhode Island, "[a]n individual right to armed self-defense implies a right to carry arms appropriate to that purpose." · Cramer, at 5. Note that this right to bear arms in self-defense obtains not only in the people's homes, on their properties, and at their places of business, but also, as in *Ventre,* wherever the people of this state may go, while traveling from one place to another, in parking lots, and while they are away from home, especially when they are attacked "with deadly weapons, or with murderous * * * intent." *Sherman,* 16 R.I. at 633, 18 A. at 1041.

It bears repeating that pistols and revolvers are not sawed-off shotguns or assault rifles, or other types of weaponry that more readily lend themselves to criminal activity and, therefore, to regulation banning their possession. *See, e.g., Carson v. State,* 241 Ga. 622, 247 S.E.2d 68, 73 (1978); *State v. Hamlin,* 497 So.2d 1369, 1371 (La.1986); *People v. Brown,* 253 Mich. 537, 235 N.W. 245, 246 (1931); *State v. LaChapelle,* 234 Neb. 458, 451 N.W.2d 689, 691 (1990). Therefore, as the court in *Brown,* 235 N.W. at 247 reasoned, although a statute that banned only those weapons that were the "arsenal of the 'public enemy' [and] the 'gangster' " constituted a reasonable exercise of the state's police power, the statute in question did not "include ordinary guns, swords, revolvers, or other weapons usually relied upon by good citizens for defense or pleasure."

Therefore, even though assault rifles, sawed-off shotguns, and other such weapons associated with criminal activity "are too dangerous to be kept in a settled community by individuals, and, in times of peace, find their use by bands of criminals," *Brown,* 235 N.W. at 246, completely precluding people from carrying pistols or revolvers when they are away from their homes or places of work infringes on the right of the ordinary citizen to bear arms

for such reasonable and lawful purposes as self-defense, *see Buckner*, 377 S.E.2d at 144–46, which is among the core rights of the people that art. 1, sec. 22 protects.

## VI

### The Department Did Not Provide Plaintiffs with Due Process When It Denied Their License Applications Under G.L.1956 § 11–47–18

#### A. Plaintiffs Have a Liberty Interest in Keeping and Bearing Arms, Including Pistols or Revolvers, That Cannot Be Denied or Infringed Without Due Process

As previously explained, art. 1, sec. 22, of the Rhode Island constitution endows plaintiffs with a protected liberty interest in keeping and bearing arms for any lawful purpose. Pistols and revolvers are types of arms. Indeed, the North Carolina Supreme Court invalidated a gun-permit statute similar to this one, observing that: "[t]he historical use of pistols as 'arms' of offense and defense is beyond controversy." *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 224 (1921).

> "[To] the ordinary private citizen * * * the rifle, the musket, the shotgun, and the pistol are about the only arms which he could be expected to 'bear,' and his right to do this is that which is guaranteed by the Constitution. To deprive him of bearing any of these arms is to infringe upon the right guaranteed to him by the Constitution." *Id.*

The North Carolina court was concerned that "[i]f the people are forbidden to carry the only arms within their means, among them pistols, they will be completely at the mercy of" hose who would terrorize them by "armed force" and that "this would place law-abiding citizens entirely at the mercy of the lawless element." *Id.* at 225. Thus, to bar or preclude a person from bearing this type of arms is to strike at one of the core purposes behind the constitutional right to bear arms.

Likewise, the Supreme Court of Michigan in *Brown*, 235 N.W. at 247, observed that the state's power to regulate weapons was

> "subject to the limitation that its exercise be reasonable, and it cannot constitutionally result in the prohibition of the possession of those arms which, by the common opinion and usage of law-abiding people, are proper and legitimate * * * for the protection of person and property." [55]

And in *People v. Zerillo*, 219 Mich. 635, 189 N.W. 927, 928 (1922), the Supreme Court of Michigan held that "while the Legislature has power in the most comprehensive manner to regulate the carrying and use of firearms, that body has no power to constitute it a crime for a person * * * to possess a revolver for the legitimate defense of himself and his property."

In this case, the department's refusal to license plaintiffs to carry these guns infringed on their constitutional right to do so because it narrowed the type of arms that plaintiffs could carry for their self-defense and for other lawful purposes without reasonable justification for doing so and without providing plaintiffs with any due process of law. Thus, the fact that plaintiffs still were entitled to keep and bear other kinds of arms does not mean that the department did not infringe their right to bear arms. *See Bliss*, 12 Ky. at 92.

The majority argues that the department's denial of licenses to allow plaintiffs

---

**55.** Article 2, section 5, of the Michigan Constitution provided: "Every person has a right to bear arms for the defense of himself and the state." *People v. Brown*, 253 Mich. 537, 235 N.W. 245, 246 (1931).

to carry pistols or revolvers with them while they are off their property and places of business did not deprive plaintiffs of their constitutional right to bear arms because they were still free to bear other types of arms, such as rifles. In other words, so this argument goes, no infringement occurs under the constitution as long as the department's denial of the right to bear arms is not total.

But I would hold that the constitution's use of the word "infringed" prohibits any substantial and unreasonable encroachment on the unqualified right of the people to "bear arms" such as these, not just those infringements that constitute a complete and total deprivation of this right. As the Kentucky Supreme Court said in *Bliss,* 12 Ky. (2 Litt.) at 91–92:

> "whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. If, therefore, the act in question imposes any restraint on the right, immaterial what appellation may be given to the act, whether it be an act regulating the manner of bearing arms or any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious."

The Fourteenth Amendment to the United States Constitution protects people from deprivations of "life, liberty, or property, without due process of law." In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the United States Supreme Court explained that:

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite. * * * [T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake."

This Court in *DiCiantis v. Wall,* 795 A.2d 1121, 1126 (R.I.2002), explained that procedural due-process issues involve a two-step analysis. "First, a plaintiff must have a protected liberty or property interest."[56] *Id.* Then, the next inquiry turns on whether the procedures afforded to the plaintiff were "'constitutionally sufficient.'" *Id.* This two-step analysis requires the Court to balance the burdens and interests of the government and the interests of the party raising a procedural due-process concern. *Millett v. Hoisting Engineers' Licensing Division of the Department of Labor,* 119 R.I. 285, 295, 377 A.2d 229, 235 (1977).

In *Lynch v. Gontarz,* 120 R.I. 149, 156, 386 A.2d 184, 188 (1978), this Court noted that the United States Supreme Court has not defined "with exactness" the liberty interests guaranteed by the Fourteenth Amendment. Yet that Court has said that "it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life * * * and gen-

**56.** As the United States Supreme Court explained in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

"[Such] interests * * * are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

erally *to enjoy those privileges long recognized * * * as essential to the orderly pursuit of happiness by free men."* *Lynch*, 120 R.I. at 156, 386 A.2d at 188 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). (Emphasis added.) Moreover, a protected liberty interest can arise from both the Due Process Clause itself and from the laws of each state. *See id.* at 156–57, 386 A.2d at 188.

As the United States Supreme Court further explained in *Paul v. Davis*, 424 U.S. 693, 710–11, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), state law defines substantive property or liberty interests:

"It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status."

As previously stated, because art. 1, sec. 22, of the Rhode Island Constitution protects an individual's right to keep and bear arms, this right is rooted in a fundamental state law and constitutes a protected liberty interest to which due-process safeguards apply. *See Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**B. The Licensing Provisions of G.L. 1956 § 11–47–18 Implicate Plaintiffs' Constitutionally Protected Liberty Interests**

The right guaranteed by art. 1, sec. 22 is a fundamental right to keep and bear arms

for any lawful purpose. Therefore, the § 11–47–18 requirement that a person obtain a license to carry a pistol or revolver potentially infringes upon that right because, if the right is denied for improper reasons or without providing applicants with due process of law, it would encroach upon the individual applicant's liberty interest to bear such arms for any lawful purpose. *See, e.g., Kellogg v. City of Gary*, 562 N.E.2d 685, 695–96 (Ind.1990) (holding that when such a right exists, guaranteed by the state constitution, a decision by the licensing authority that denies citizens the ability to apply for a handgun license implicates a fundamental constitutional right). Thus, in *Schubert v. DeBard*, 398 N.E.2d 1339, 1341 (Ind.Ct.App.1980), the court said:

"In Schubert's case it is clear from the record that the superintendent decided the application on the basis that the statutory reference to 'a proper reason' vested in him the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself.

"Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved."

Likewise, here, §§ 11–47–8 and 11–47–18, as administered by the department in this case, infringed upon plaintiffs' fundamental constitutional right to bear arms without affording them due process of

law.[57] These statutes not only restrict the carrying of concealed weapons, but they also provide that a license must be obtained if the pistol or revolver is to be carried openly by a person, "whether concealed or not." Section 11–47–18(a). Because this provision potentially "remove[s] or significantly alter[s] that protected status," *Paul,* 424 U.S. at 711, 96 S.Ct. 1155, by restricting a person's constitutional right to bear such arms for his or her own self-defense and for other lawful purposes, the department must afford applicants due-process safeguards to assure that the state government does not arbitrarily infringe upon this fundamental right. Indeed, many states have held that the right to keep and bear arms, guaranteed by their state constitutions, protects, through *substantive* due process, the right to openly carry a weapon off one's own premises without a license. *See Zerillo,* 189 N.W. at 928; *City of Las Vegas v. Moberg,* 82 N.M. 626, 485 P.2d 737, 738–39 (Ct.App.1971); *Kerner,* 107 S.E. at 225; *State v. Blocker,* 291 Or. 255, 630 P.2d 824, 827 (1981).

The majority relies on *Erdelyi v. O'Brien,* 680 F.2d 61, 63–64 (9th Cir.1982), for the proposition that a statute providing that a licensing authority "may" issue a permit to carry a concealed weapon does not confer a property or liberty interest on an individual seeking such permit. *Erde-*

*lyi* is distinguishable, however, for two reasons. Unlike Rhode Island, the State of California did not have a state constitutional provision that guaranteed the people of that state a right to bear arms.[58] Additionally, unlike the plaintiff in *Erdelyi,* plaintiffs in this case are not claiming that the licensing statute confers a liberty interest on them to obtain a license to carry a concealable weapon. Rather, they assert that they were entitled to due-process protections under the state constitution when they applied for a license because of their state constitutional right to bear arms and to obtain due process of law in connection with any potential infringement of that right. As previously noted, the department's denial of a license for plaintiffs to carry a pistol or revolver on their person implicates this fundamental constitutional right.

Although the state may exercise its police-power authority under § 11–47–18 to regulate the issuance of licenses, it must afford procedural due-process protections to applicants when deciding whether to deny an applicant a license because of the department's asserted need to protect the health, welfare, and safety of the citizens of Rhode Island—especially when the statute, as in this case, extends to prohibit the unlicensed carrying of open weapons.[59]

---

**57.** Section 11–47–8(a) provides in pertinent part:

"No person shall, without a license or permit issued as provided in §§ 11–47–11, 11–47–12 and 11–47–18, carry a pistol or revolver in any vehicle or conveyance, or on or about his or her person whether visible or concealed, except in his or her dwelling house or place of business or on land possessed by him or her * * *."

Section 11–47–18(a) provides in part: "The attorney general may issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person upon a proper showing of need * * *."

**58.** California's constitution art. 1, § 5, provided: "The military is subordinate to civil power. A standing army may not be maintained in peacetime. Soldiers may not be quartered in any house in wartime except as prescribed by law, or in peacetime without the owner's consent."

**59.** Indeed, the North Carolina Supreme Court, among other courts, struck down such a statute as an unreasonable prohibition of the right to bear arms:

"The statute in this case, Public Local Laws 1919, c. 317, is especially objectionable in that it requires (section 2) that in order to carry a pistol off his own premises,

## C. The Procedure Used to Deny Plaintiffs Licenses to Carry Concealable Weapons Does Not Survive Strict Scrutiny

Although I believe that there is an individual right to keep and bear arms, I do not agree that there is an absolute right of every applicant to carry any type of concealable weapon. *See Carson*, 247 S.E.2d at 73. But when a liberty interest exists, we must strictly scrutinize state regulation of such interests. *Morris v. D'Amario*, 416 A.2d 137, 140 (R.I.1980). And when government action potentially infringes upon a fundamental liberty interest, the state's action must advance a compelling interest, and the procedure employed must be the least restrictive means to effectuate the state interest. *Id.*

Thus, the state may regulate the people's constitutionally protected right to keep and bear arms by implementing certain reasonable police-power measures, such as requiring applicants to obtain a license to carry a concealable weapon. *Storms*, 112 R.I. at 126, 308 A.2d at 466. As this Court held in *Storms*, 112 R.I. at 126, 308 A.2d at 466, the General Assembly, "in the interest of the public safety and welfare," was entitled to enact §§ 11–47–11 and 11–47–18, requiring a license for people to carry such weapons on their person. The General Assembly "in assigning the licensing authority under the Firearms Act [to the department] did not unlawfully delegate its power." *Storms*, 112 R.I. at 128, 308 A.2d at 467. But because the state has imposed this limitation on the constitutionally protected right to keep and bear arms by requiring individuals to apply for a license to carry these concealable weapons, due-process protections must be afforded to all individuals who apply for a license under § 11–47–18.

When state law creates a liberty interest, as art. 1, sec. 22 does here, "the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Wolff*, 418 U.S. at 558, 94 S.Ct. 2963. This means that "some kind of hearing is required at some time before a person is finally deprived of his property [or liberty] interests." *Id.* at 557–58, 94 S.Ct. 2963 (holding that the "analysis as to liberty parallels the accepted due process analysis as to property"). Here, the need for procedural due-process protection is great because of the potentially infringing consequences that § 11–47–18 imposes on the people's constitutionally protected right to bear arms. Also, the decision of whether to grant or deny a license depends heavily on fact-finding by the licensing authority. Thus, this is a

even openly, and for a lawful purpose, the citizen must make application to the municipal court, if a resident of a town; or to the superior court, if not residing in town, describing the weapon and giving the time and purpose for which it may be carried off his premises and must pay to the clerk of the court the sum of $5 for each permit and must file a bond in the penalty of $500 that he will not carry the weapon except as so authorized. In the case of a riot or mob violence, or other emergency requiring the defense of public order, this would place law-abiding citizens entirely at the mercy of the lawless element. As a regulation even this is void because [it is] an unreasonable regulation, and, besides, it would be void because for all practical purposes [because] it is [a] prohibition of the constitutional right to bear arms. There would be no time or opportunity to get such permit and to give such bonds on an emergency." *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921); *see also In re Brickey*, 8 Idaho 597, 70 P. 609, 609 (1902) ("A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.").

process that is well served by requiring a hearing before the licensing authority reaches any final decision. The licensing procedures used in this case, however, failed to provide plaintiffs with due process because the state provided no notice to them of what would constitute a proper showing of need, promulgated no regulations concerning this process as required by law, allowed the department to deny such applications for any reason or no reason at all, and denied plaintiffs a meaningful opportunity for a hearing before the decision became final.

As the majority acknowledges, pursuant to § 11–47–11, a resident of this state, may apply to his or her local city or town licensing officials for a weapons permit that, if granted, permits the applicant to carry a pistol or revolver "concealed upon his or her person." [60] But § 11–47–11(a) only vests the local authorities with the ability to issue a permit that allows the applicant to carry a pistol or revolver "concealed upon his or her person." If the applicant wishes to carry such a weapon openly, he or she must still apply to the department pursuant to § 11–47–18.

Notably, the majority's suggestion that the issuance of permits under § 11–47–11 is mandatory minimizes the enormous discretionary mischief implicit in § 11–47–11's requirement that the local licensing authority must deem the applicant to be a "suitable person," a term that the statute does not define.[61] Thus, it is unclear whether any local licensing authority would have afforded plaintiffs the requisite procedural due-process protections if they had applied for permits pursuant to the provisions of § 11–47–11. The department's Chief McAteer testified that, although he was not the "court of last resort," he "quite frankly" had no knowledge of what procedures were available at the local level. Therefore, speculation about

---

**60.** Section 11–47–11(a) provides, in part:

"The licensing authorities of any city or town shall, upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, *issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver* everywhere within this state * * * if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, *and that he or she is a suitable person to be so licensed."* (Emphases added.)

**61.** In its amicus curiae brief, the Citizens Rights Action League has suggested to this Court that local licensing authorities, to whom one seeking a permit pursuant to § 11–47–11 must apply, effectively have circumvented the requirement of § 11–47–11(a) by interpreting the term "suitable" to require that an applicant for a license under this local licensing law first must seek and obtain a permit from the department pursuant to § 11–47–18(a) *before* the local authority will even consider a permit applicant to be "suitable" under § 11–47–11. Local licensing authorities adopted this stance, we are told by this amicus, at the urging of the department on the theory that each local licensing authority could take the position with gun-permit applicants that no applicant could or would be considered "suitable" until and unless the department first granted him or her a license under § 11–47–18. Thus, far from allowing § 11–47–11(a) to constitute an alternative method of obtaining a gun permit, the department, with the assistance of local law-enforcement and licensing authorities, effectively can shut down the gun-permit pipeline completely by excluding all applicants that the department arbitrarily deems to be "unsuitable." Surely, such an administrative scheme allows government regulation to sink to its most Kafkaesque and insidious depths of arbitrariness.

what might have happened if the plaintiffs had applied for weapons permits pursuant to § 11–47–11 is neither before this Court, nor does it cure the constitutional ills afflicting the department's actions in arbitrarily denying plaintiffs applications submitted to it under § 11–47–18.

Finally, what is truly "of no moment to this appeal" is the majority's citation to various statutes that limit or restrict the use, possession, and sale of firearms in this state. As previously discussed, the General Assembly "in the interest of the public safety and welfare" was entitled to enact §§ 11–47–11 and 11–47–18 and other such laws regulating the use and possession of firearms. But such licensing and regulatory schemes cannot be administered in an arbitrary or discriminatory manner, especially when it comes to pistols, revolvers, and other core arms used for self-defense and for other lawful purposes. *See Storms*, 112 R.I. at 126, 308 A.2d at 466.

Thus, "[t]he courts of many states have upheld statutes which restrict the possession or manner of carrying personal weapons * * * [because this type of] regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution." *State v. Kessler*, 289 Or. 359, 614 P.2d 94, 99 (1980). But when, as here, a plaintiff brings a procedural due-process claim, the plaintiff does not allege that the state action is an improper deprivation or infringement of a constitutionally protected right; rather, the claim is that the state regulation may be "entirely legitimate," but that the state has exercised its legitimate regulatory powers in an arbitrary manner or by a "fundamentally flawed" procedure. *Daniels v. Williams*, 474 U.S. 327, 338–39, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring).

In sum, the state may not deprive the people of their constitutionally protected right to bear pistols or revolvers for lawful purposes without ensuring that the procedural protections of due process are in place to guard against arbitrary deprivations and unreasonable exercises of the state's police power. In this case, these protections "went missing."

Moreover, the existence of numerous statutes that regulate arms use, ownership, and possession does nothing to curtail the higher right that art. 1, sec. 22, guarantees to the people of this state. After all, the constitution is the supreme law of this state, not its statutory laws. *See* R.I. Const. art. 6, sec. 1 ("This Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void."); *Gorham v. Robinson*, 57 R.I. 1, 10, 186 A. 832, 838 (1936) (the constitution vests all legislative power in the General Assembly, save that which the constitution expressly limits). Thus, even the enactment of a whole slew of statutes that are contrary to just one measly state or federal constitutional provision will not serve to amend that one constitutional provision, which still reigns supreme, notwithstanding a myriad of state statutes that may be inconsistent with its provisions.

## VII

**The Department of the Attorney General Is Subject to the APA's Rulemaking Procedures and Any Licensing Determination Made by the Department Pursuant to § 11–47–18 Can Be Reviewed on an APA Appeal**

"Agency" is defined under G.L.1956 § 42–35–1(a) of the Administrative Procedures Act (APA) as: "each state board, commission, department, or officer, other than the legislature or the courts, authorized by law to make rules or to determine contested cases." Entities subject to the APA include "all agencies as defined in § 42–35–1(a) and all agencies, * * * de-

partments, and officers authorized by law to make rules or to determine contested cases." Section 42–35–1.1. A "[c]ontested case" under § 42–35–1(c) means: "a proceeding, including but not restricted to ratemaking, price fixing, and *licensing*, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing." (Emphasis added.)

Here, the department is an "agency" as that term is defined in § 42–35–1(a) because it is authorized by law to make rules. An agency is an entity that performs a statewide function, has statewide authority, and receives state money. *City of Providence v. Local 799, International Association of Firefighters*, 111 R.I. 586, 588–89, 305 A.2d 93, 95 (1973). The department can, pursuant to § 11–47–18, adjudicate cases and make rules affecting the rights and obligations of private parties. *See Petition of Rhode Island Bar Association*, 118 R.I. 489, 491, 374 A.2d 802, 803 (1977). Additionally, the department and the Bureau of Criminal Identification [62] are not explicitly exempted from the APA under § 42–35–18.

The department determines "contested cases" when it decides whether to issue gun licenses under § 11–47–18. This Court held in *Colonial Hilton Inns of New England, Inc. v. Rego*, 109 R.I. 259, 263, 284 A.2d 69, 71 (1971), that a proceeding involving the plaintiff's application for a building permit constituted a contested case within the APA, even though the statute under which the plaintiff filed the application did not explicitly provide for a hearing. In that case, the Court held that the provisions of the APA applied despite the lack of a hearing requirement in the statute because the plaintiff was a party "whose [riparian] 'rights, duties, or privi-

leges' [were] to be determined" by the Department of Natural Resources. *Id.*

The majority concludes that because § 11–47–18 lacks any hearing requirement, an application for a gun license is not a "contested case" subject to the APA. The majority distinguishes this case from *Colonial Hilton* because *Colonial Hilton* involved determining riparian rights, which the General Assembly has recognized as a state-created property interest. Therefore, the majority concludes, "procedural due process would call for a hearing to determine whether" denial of an application to erect a wharf would impermissibly impair this right.

Because art. 1, sec. 22, protects an individual right to keep and bear arms for any lawful purpose, the statute in question, § 11–47–18—requiring any person to obtain a license to carry a pistol or revolver "whether concealed or not"—naturally implicates plaintiffs' "legal rights, duties, or privileges," § 42–35–1(c), just as the statute at issue in *Colonial Hilton* affected the riparian rights of the plaintiff in that case. As previously noted, due-process and liberty-interest protections arising from the constitution attach to decisions under § 11–47–18; therefore, plaintiffs were entitled to some kind of a hearing before the department could finally deny them a license. Like the building permit applied for in *Colonial Hilton*, licensing decisions under § 11–47–18 qualify as contested cases under the APA.

Also, because I believe the department is subject to the provisions of the APA, I would hold that the department must promulgate rules to govern the licensing process that comply with the mandates of that act. Pursuant to the APA, the department must do more than merely promulgate in-

---

**62.** The Bureau of Criminal Identification is a department within the Department of Attor-

ney General, of which Chief McAteer was the administrative head.

ternal, nonbinding "guidelines" to oversee the application process. I would hold that the department must comply with the notice, procedure, publication, and filing requirements for rulemaking outlined in §§ 42–35–2 to 42–35–6. In so holding, I would require the department, in promulgating rules that define what constitutes "a proper showing of need," § 11–47–18(a), to be mindful of what this Court said in *Storms* about the purpose of the Firearms Act: namely, "to prevent criminals and certain other persons from acquiring firearms generally and handguns in particular *without at the same time making unduly difficult such acquisition for other members of society.*" *Storms*, 112 R.I. at 127, 308 A.2d at 466. (Emphasis added.) In keeping within this statutory intent, I believe the department must avoid setting the "need" bar so high that it infringes on the fundamental right guaranteed to the people of Rhode Island to keep and bear arms for any lawful purpose.

In addition, because the determination of whether to issue a gun permit pursuant to § 11–47–18 is a "contested case" under the APA, judicial review of the department's decision is provided for by § 42–35–15. Judicial review of a contested case under § 42–35–15(a) applies, in part, to "[a]ny person who has exhausted all administrative remedies available to him within the agency, and who is aggrieved by a final order in a contested case." When state action potentially infringes on a protected liberty interest, as it does in this case, due process demands that some sort of flexible procedure be set in place as well as some kind of hearing. *See Wolff*, 418 U.S. at 560, 94 S.Ct. 2963; *Roth*, 408 U.S. at 570, 92 S.Ct. 2701. Under § 42–35–1(c), each plaintiff was a "specific party" whose

"rights, duties, or privileges" afforded by § 11–47–18 were determined by the department. And judicial review in the Superior Court, under § 42–35–15(a), of the department's denial of such licenses is appropriate because each plaintiff was a "person who ha[d] exhausted all administrative remedies available to him within the [department], and who [was] aggrieved by [the department's] final order." *See* § 42–35–15(a).

## VIII

### Judicial Review by Writ of Certiorari, in Accordance With the Majority's Conclusion, Will Be Impractical and Ineffective

Given that judicial review in the Superior Court of a licensing denial under § 11–47–18 is appropriate under the APA, this case is properly before this Court on appeal from the Superior Court's judgment affirming the department's licensing decision. Reviewing such cases only on certiorari, as endorsed by the majority, does not provide a meaningful review of the department's licensing decisions under § 11–47–18. According to the majority, the department has virtually unfettered discretion to deny an application for a gun permit pursuant to § 11–47–18(a). Indeed, according to the majority, "§ 11–47–18 vests the department with extremely broad discretion to grant or deny a license even when there has been 'a proper showing of need.'" Therefore, if the department possesses this type of unfettered discretion in determining who may receive a license under § 11–47–18, then any articulation of an alleged lack of a proper need that the department chooses to use must be upheld on review as sufficient.[63] Presumably,

---

**63.** For example, if, according to the department, any given applicant for a gun license could change his or her lifestyle to obviate the

asserted "need" for a license to carry a pistol, then the department can deny the license application with impunity because, under the

therefore, the Court will have little or nothing to review on certiorari because if the department is not required to issue a permit even on a proper showing of need, how could any applicant obtain reversal of a license denial on review by certiorari? For this reason, review on certiorari of the department's denial of a gun license will prove to be a meaningless exercise because, by according the department the right to deny a license even after the applicant has made a proper showing of need, any articulated reason—no matter how flimsy, insubstantial, or restrictive of the applicant's right to bear arms for any lawful purpose—must be deemed sufficient to affirm the department's denial of a gun license.

## Conclusion

For these reasons, I would hold that art. 1, sec. 22, of the constitution guarantees to the people of this state an individual right to keep and bear weapons of this type for any lawful purpose. Nevertheless, the provisions of § 11–47–18, as applied, could constitute a reasonable regulation of this right, provided the department did not administer the statute in such an arbitrary fashion as to deny qualified applicants a license to carry a pistol or revolver for any lawful purpose. Given the constitutionally protected right to bear arms, a liberty interest exists that requires the department to afford procedural due-process protections to people such as these plaintiffs who applied for a permit to carry a pistol or revolver under § 11–47–18. Therefore, I would hold that licensing constitutes a "contested case" as defined in the APA; and because the department is an agency subject to the provisions of the APA, licensing denials such as these are appropriate for Superior Court judicial review pursuant to § 42–35–15(a). Lastly, I would

hold that because an applicant's ability to carry a handgun depends on whether the department grants or denies a license under § 11–47–18, the department must comply with the mandates of the APA when promulgating rules and procedures for approving and/or denying applications for a license. Thus, I would reverse, vacate the Superior Court's judgment and the department's arbitrary denial of these plaintiffs' licenses, and remand this case with directions for the Superior Court to enter a declaratory judgment in plaintiffs' favor that requires the department to promulgate regulations under the APA and thereafter allows plaintiffs to apply for licenses pursuant to the APA's provisions for contested cases.

Checking arbitrary power and protecting our precious personal liberties are the twin towers of constitutional adjudication, the quintessence of constitutional law, and the most important jurisprudential duties that we justices of the highest court in this state can possibly perform. If we fail or err in our judgments on this score, let us err on the side of over-checking arbitrary government power and of over-protecting our precious personal freedoms. Because if we go too far, countervailing checks on the Judiciary enable the people, through their elected representatives, to reverse what we have done either by legislative or, as in this case, by constitutional amendments. Thus, our interpretation need not be the final word or the last resort.

But if we err on the side of under-checking arbitrary power and under-protecting our constitutionally protected rights, who will undo this injustice? Who will be so courageous or so foolhardy as to reap the whirlwind by standing up to unchecked governmental power? And who will protect our precious personal free-

---

majority's rationale, such a basis for denial would be impervious to review on certiorari.

doms if we judges, who are sworn to uphold the constitution and laws of this state, who have life tenure, and who are charged by law with fulfilling this awesome responsibility, are—for whatever reasons one may profess—unwilling or unable to do so?

For these reasons, I respectfully dissent.